ZEHREN, Respondent, vs. THE MILWAUKEE ELECTRIC RAILWAY & LIGHT COMPANY, Appellant.

ROBRAN, Respondent, vs. SAME, Appellant.

*March 4 — March 22, 1898.*

*Electric street railways: Country highways: Additional burden: Changing grade.*

1. An electric railway for the carriage of passengers between cities, which is constructed and operated upon a country highway, is an additional burden upon such highway, and its proprietors cannot, even with the permission of the town authorities granted for the sole purpose of enabling them to do so, cut down the highway so as to seriously impair the rights of an abutting owner to access to his lot, without his consent or the payment of compensation to him.

[2. Whether the power of town boards to change the grade of highways extends beyond such changes as may be necessary to make them safe for travel, to the prejudice of abutting owners, questioned but not decided.]

APPEALS from orders of the superior court of Milwaukee county: GEO. E. SUTHERLAND, Judge. *Affirmed.*

These are two actions in equity brought to permanently enjoin the defendant railway company from grading down the highway in front of the residences of the plaintiffs, and from laying an electric street railway thereon. The cases are identical in their facts, and but one statement will be necessary. The facts appearing by the complaint and the affidavits used upon the motion to dissolve the preliminary injunction were substantially as follows:

Oakland avenue is a highway sixty feet in width, running north and south in the city of Milwaukee, and extends northward into the town of Milwaukee, and reaches the village of White Fish Bay, which is an incorporated village of four or five hundred inhabitants, whose southern boundary is about one and one-half miles north from the northern boundary of the city of Milwaukee. The plaintiffs own, respectively, two small lots on which they reside, fronting on the east side of this highway, about one quarter of a mile north of the city limits of Milwaukee. This highway has existed and been traveled by ordinary travel for many years, during all of which time there has been a grade in front of the plaintiffs' lots, ascending to the north about one foot in twenty-one, and the plaintiffs' lots are now four or five feet above the grade. This grade extends for a distance of 800 feet along the highway, and for an additional 300 feet there is a grade of one foot in thirty feet. Most of the property on the highway from the city limits north past the plaintiffs' lots has been platted into city lots, and many of the lots have been sold; but the greater part of them are held by nonresident owners for sale, and are not occupied or improved. There are about twenty-five actual residents upon the road from the limits of the city to the limits of White Fish Bay. The village of White Fish Bay is composed largely of people doing business in Milwaukee.

The defendant owns and operates substantially the entire electric street railway system of the city of Milwaukee, and carries passengers only. In the summer of 1897 many of the inhabitants of White Fish Bay desired an extension of the defendant's electric street railway on Oakland avenue to the village of White Fish Bay; and the defendant was desirous of making that extension, but it declined to build the line unless the steep grade above mentioned was considerably reduced; and, after negotiations with the town board of the town of Milwaukee, a written agreement was made

between the defendant and the town board, August 17, 1897, by which the defendant was allowed to build its electric road for passenger service upon Oakland avenue, past the plaintiffs' premises, and to operate it under certain conditions for fifty years, provided that it would grade the highway at its own expense, and save the town harmless from all damages by reason of the change of grade, such new grade being made according to a profile attached to the agreement. By this agreement and profile the highway was to be cut down in front of plaintiffs' lots, and for a long distance on either side of them, and was to be filled in at other places so as to reduce the grade. The depth of the cut in front of the plaintiffs' premises was about eight feet, and the width of the cut at the bottom thirty-six feet, with the sides sloping back on each side to the street line. Afterwards, on October 16th following, the town board made an order fixing the grade of the street as indicated in the profile. A large proportion of the property owners on the highway along the line of the proposed change consented, in writing, to the change; but others, including the plaintiffs, did not consent. By the change proposed, the lots of the plaintiffs were to be left from twelve to fourteen feet above the roadbed, and access to them by team will be either entirely cut off or made very difficult.

A temporary restraining order was obtained upon the complaint and accompanying affidavits in each case at the commencement of the actions. Afterwards the defendant appeared, and, upon affidavits, moved in each case to vacate the order, which motions were denied, and the defendant appeals in both cases.

For the appellant there was a brief by *Miller, Noyes, Miller & Wahl*, and oral argument by *Geo. P. Miller*. They argued, *inter alia*, that a lot owner was not entitled to damages for a change of grade of a highway in front of his premises. *Colclough v. Milwaukee*, 92 Wis. 186; *Harrison*

*v. Milwaukee Co.* 51 id. 645. The town board of supervisors had the right to change the grade of the highway in question in this case, and to do the work either by itself or by the railway company, and the latter, in doing it under the authority of the board, was not liable to the abutting owners. Booth, St. Ry. Law, 133–139. The town board had a right under sec. 3, ch. 313, Laws of 1860, and secs. 1862, 1863, R. S. 1878, to grant the franchise to the defendant company. The avenue upon which this railway is to be operated is not an ordinary country road, but a highway leading into a populous suburb. *Chicago & N. W. R. Co. v. M., R. & K. E. R. Co.* 95 Wis. 561–572. An electric street railway upon a country road is not an additional burden, and the abutting owner is not entitled to compensation therefor if it does not impair his right of access to his property. When land is taken for a highway the owner is entitled to receive the full value thereof. *Norton v. Peck,* 3 Wis. 714; S. & B. Ann. Stats. sec. 1848. Full value having been paid for the land used for a highway, the legislature may authorize, without further compensation, the construction of a street railroad upon it, so long as that does not interfere with its use as a street. *Hobart v. Milwaukee City R. Co.* 27 Wis. 194. Our statutes relating to highways are, with slight modifications, derived from those of Massachusetts, and the decisions of the courts of that state are valuable in determining the uses to which a street may be put without additional compensation. *Pierce v. Drew,* 136 Mass. 80; *Chase v. Sutton Mfg. Co.* 4 Cush. 152, 167; *Boston v. Richardson,* 13 Allen, 146, 160; *Comm. v. Temple,* 14 Gray, 69, 77; *Comm. v. Lowell G. L. Co.* 12 Allen, 75; *Att'y Gen. v. Metropolitan R. Co.* 125 Mass. 515, 517; *Lincoln v. Comm.* 164 id. 9. Many other states have adopted the same doctrines. Booth, St. Ry. Law, §§ 82, 83; *Hewett v. W. W. T. Co.* 4 Mackey, 424; *Irwin v. G. S. Tel. Co.* 37 La. Ann. 63; *Cater v. N. W. Tel. Exch. Co.* 60 Minn. 539; *Peo-*

*ple v. Eaton,* 100 Mich. 208; *Julia Building Asso. v. Bell Tel. Co.* 88 Mo. 258; *Gay v. M. U. Tel. Co.* 12 Mo. App. 485; *Hirshfield v. Rocky Mt. Bell Tel. Co.* 12 Mont. 102; Mills, Eminent Domain, § 187.   An electric street railroad outside of city limits but in a suburb is not an additional burden. *Chicago & N. W. R. Co. v. M., R. & K. E. R. Co.* 95 Wis. 567.

For the respondents there was a brief by *O'Connor, Hammel & Schmitz,* and oral argument by *A. J. Schmitz* and *Leopold Hammel.*

WINSLOW, J.   The defendant proposes to construct and operate an electric street railway for the carriage of passengers upon a highway in a country town outside of the city limits of Milwaukee, and, for that purpose and by permission of the town authorities, to cut down the highway about eight feet, so that an abutting owner's right of access to his property will be seriously impaired; and the question is whether this can be done without the consent of the abutting owner, and without the payment of compensation to such owner.

The question is a new one in this court, and one the importance of which, in view of the rapid development of electric power as a means of carriage for long distances, can hardly be overestimated.   If the highway in question in this case can be so used, the question at once arises whether every country highway may not be used in the same way. If it be said that the highway before us in this case is in effect a city street because of its close proximity to the city, and because the adjoining lands are platted, and because it connects a suburban village with the city, and that a clear distinction ought to be drawn between such a highway and the ordinary country road in farming districts, the inquiry will then be, Can such a distinction be practically drawn, and can it be satisfactorily applied, and upon what solid

grounds will it rest? A distinction so important must in reason be one which can be drawn with some reasonable degree of certainty in every case, and must be capable of practical application. Is the line to be drawn according to density of population, and, if so, what degree of density is to be the test? Is it to depend upon the activity and hopefulness of adjoining landowners in platting their land into building lots, or upon the question whether a neighboring village or town can properly be called a suburb of the principal city? Or is it to depend upon a judicious consideration of all these conditions massed together, and upon a conclusion to be evolved from the entire mass, which will determine the answer to the question in each particular case, but in no other? Or, on the other hand, must it be held that, in order to make a highway a city street, it must lie within the corporate boundaries of the city, and that outside of those boundaries no reasonable or practicable distinction can be drawn based either on proximity to the city, or on platting of lands or density of population, or upon the fact that the highway connects the city with a neighboring suburban village? These are all important questions, which, as before indicated, are new in this court, and demand careful consideration.

It was long ago held by this court, following the well-nigh universal current of authority, that a horse railway constructed upon grade in a city street, and by permission of the city authorities, was not an additional burden upon the fee, and that the adjoining landowner was not entitled to compensation therefor. *Hobart v. Milwaukee City R. Co.* 27 Wis. 194. In a recent case it was further held by this court that an electric railway constructed under a charter authorizing it to carry passengers, merchandise, baggage, mail, and express matter, and running from city to city, was not a street railway, within the meaning of the *Hobart Case*, so far as it passed over the highways of intervening country

towns, and that it could not use such highways without the consent of, or compensation paid to, the owners of the abutting real estate. *Chicago & N. W. R. Co. v. M., R. & K. E. R. Co.* 95 Wis. 561. No other decisions directly bearing on the controversy before us now have been made in this court, and it is manifest that neither of the cases referred to is decisive of the questions here involved.

In other courts there have been decisions holding more or less directly that an electric street railway upon a city street constructed with poles and a trolley wire stands in the same legal situation as a horse railway, and does not constitute necessarily an additional burden to the fee. These cases will be found cited in the note to § 83 of Booth on Street Railway Law, although it is entirely clear that the cases cited do not all support the broad proposition which the writer lays down. Most of these cases were reviewed by RAGAN, C., in *Jaynes v. Omaha St. R. Co.* (Neb.), 74 N. W. Rep. 67, and it is not deemed necessary to review them in this opinion, as the question is not before us. The Nebraska case cited seems to reach the conclusion that if an electric street railway on a city street moves its cars without occupying permanently any part of the street with poles or wires, as, for instance, by storage batteries, it does not constitute an additional burden simply because the motive power is electricity; but that the planting of poles in the street, so as to interfere with an abutting owner's right of access to his property, will constitute an additional burden, for which compensation must be made. We have been referred to no case which squarely holds that the mere fact that the cars upon a street railway in a city street are propelled by electricity by the overhead trolley system, instead of by animal power, makes the railway, as a matter of law, an additional burden, although very vigorous dissenting opinions to that effect may be found in the case of *Detroit City R. Co. v. Mills*, 85 Mich. 634.

The question has not been presented to this court, and hence has not been decided, and cannot be decided now. The question here presented is whether such a railway is an additional burden when it is to be operated upon a highway in a country town, and when, also, the railway company proposes to grade down the highway, for the purpose of laying its track, to such an extent as to seriously impair the right of access of adjoining lot owners. It is very evident that this last-named consideration is an important one.

Conceding for the moment that the highway should be treated as a city street, and that an electric trolley system operated upon grade upon such a street is not an additional burden upon the fee, still it has not been yet held by this court that the public authorities could lawfully authorize a street railway company to grade down a street for the express purpose of laying its tracks and operating its road to the impairment of the abutting owners' right of access. It was said in *Hobart v. Milwaukee City R. Co.* 27 Wis. 194, that a horse railway upon a city street was not an additional burden "except when some private right of such an owner (as his free access to his own land or buildings) has been materially impaired thereby;" and this is certainly in accord with the authorities. Now, it appears very conclusively here that the proposed grading of the highway is about to be done by the defendant company, by consent of the town authorities, for the express purpose of enabling the company to successfully build and operate its street railway. One of the officials of the company, whose affidavit was used upon the hearing of the motion, deposed that the defendant's cars could not be practically or economically operated over the highway if the grade were not changed, and that the company had always refused to extend its line on that account, and that, before it consented to extend the line, it insisted that the new grade be established. It was evidently solely in consequence of this demand by the street railway com-

pany that the town authorities made the agreement with
the company, binding it to do the grading at its own ex-
pense, and to hold the town harmless from all claims for
damages resulting therefrom.   There does not seem to have
been any other demand that the grade be changed.   The
highway had been in use for many years, and had sufficed
for all ordinary purposes of travel; and it is evident that
the change was to be made simply to meet the requirements
of the street railway service, and in pursuance of the demand
of the company.   It is, of course, true that the bed of the
highway, when graded, would have a somewhat easier grade
for the uses of ordinary travel, but that seems to have been
merely an incidental result.   The object aimed at was to fit
the highway for the corporate uses of the street railway
company, and hence it was very reasonably insisted by the
town authorities that the railway company, being the bene-
ficiary, should defray the expense.   This being so, the ques-
tion is whether in fact the railway company is not about to
materially impair the right of access of the adjoining lot
owners by the construction of its railroad, within the mean-
ing of the decision in the *Hobart Case*, and whether it can
do so without compensation.

It is said on behalf of the company that the town board
has full power to change the grade of the highway at pleas-
ure, and without payment of compensation to lot owners,
and that the company is simply acting as the agent or em-
ployee of the town board in doing the grading, and hence
that such grading cannot be considered as any part of the
construction of the railroad, but rather the exercise of the
power of the town to grade highways.

It has been held in this state that cities and other mu-
nicipal corporations which are endowed with power to fix
and change the grades of streets are not liable to adjoining
lot owners for such changes, in the absence of express stat-
utory provision for compensation.   This principle is so well

established that it is unnecessary to cite authorities in its support. The assumption that town boards have the same broad powers as to the grading of highways as are generally conferred upon the authorities of cities is somewhat doubtful, to say the least, if not unwarranted by the provisions of the statutes. It is true that town boards have the care and supervision of the highways and bridges of the town, and it is their duty to see that they are kept in repair, and that obstructions are removed. They are also required to divide the town into road districts, and levy highway taxes, and to require the overseers of highways to perform their duties, and they have power to lay out new highways. R. S. 1878, sec. 1223, as amended by ch. 103, Laws of 1885. These comprise the general duties of the town boards as to highways, and we are not referred to any section empowering the board to make any such radical change of grade as was attempted here, in the absence of some showing that such grading was necessary in order to make the highway safe for travel. Doubtless, the board may make such changes in the surface of the road as will make it safe for travel, because they are charged with the duty of providing reasonably safe highways, and they must, of course, possess powers broad enough to carry out this very important duty; but, when it cannot be shown that a change is necessary to accomplish this purpose, the question as to their power to make a change prejudicial to the adjoining property owners seems doubtful. We do not, however, decide this question, because we do not deem it necessary. Grant, if you please, that the power exists; still it is entirely certain that it is a power to be exercised solely for the public good, and not for the benefit of a private corporation or individual. Upon this subject the following very pertinent remarks are made in Elliott, Roads & Streets, 558, note 4: " The rule that municipal corporations may change the grades of streets at pleasure is, at best, not easily defended, and to so extend it as to make

Zehren vs. The Milwaukee Electric R. & L. Co.  Robran vs. Same.

it work for the benefit of a private corporation at the expense of a property owner, is giving a harsh rule an application that it should never receive. . . . We do not believe that the discretionary power to change grades of streets exists where the change is solely for the benefit of a private corporation or individual. We cannot avoid the conviction that the courts may inquire whether the change is for municipal purposes or exclusively for the benefit of a private corporation, and if they find that it is solely for the benefit of such a corporation, they may rightfully interfere."

These views seem to us reasonable and just. In the present case it is certain that the attempted change of grade was made at the demand of, and primarily for the sole benefit of, the street railway company. No fact could be more clearly proven than this fact is in the case. Whatever small benefits the general public may receive in the way of an easier grade for vehicles or the privilege of riding upon the electric cars are merely incidental to the main object. That main object was and is the pecuniary benefit to the street railway company arising from the operation of street cars over the highway, which was impracticable before the change, and will be practicable after the change. The town authorities had no intention of grading the street, and the public did not demand it. We believe public powers which are held in trust to be exercised for the benefit of the whole people ought not to be, and cannot be, farmed out to an individual for his own especial benefit, when private rights are thereby invaded. Such proceedings seem to us clearly against public policy. The vice lies not in the fact that the work is physically done by the street railway company instead of by employees of the town. The town may probably choose its own agents, to whom it may intrust the performance of lawful *public* works. But the vice lies in the fact that the work itself is primarily and essentially private work, done by a private corporation, for the ad-

vancement solely for its own ends, and is not a work demanded by the public, or which would be undertaken by the town as a necessary public work.

The question is certainly not free from difficulty. It is stated in Booth, St. Ry. Law, § 92, that if a street railway company, acting under authority of the city council in laying its tracks, changes the grade of a street to conform to a new grade established by the municipality, and does the work properly and skilfully, as directed by the city authorities, it will not be liable to an abutting owner for incidental damages. The cases cited in support of the doctrine seem to be cases where the city, acting in exercise of its undoubted powers, has fixed the grade of the street for the benefit of the whole public, and thereafter the railway company has built its road, and done the necessary grading to put its tracks upon the legal grade. *Briggs v. Lewiston & A. H. R. Co.* 79 Me. 363; *Inter-State C. R. T. R. Co. v. Early,* 46 Kan. 197. Such cases are manifestly not this case. It is very certain that a street railway cannot change the grade of a street to suit itself, and thereby injure the property owner's right of access to his property. Booth, St. Ry. Law, § 91; *Nichols v. Ann Arbor & Y. St. R. Co.* 87 Mich. 361. Regarding the change of grade here to be made as substantially a change made by the railroad company for its own ends, and purely to enable it to operate its road successfully, we are unwilling to subscribe to the doctrine that the mere consent of the town authorities will free the railway company from liability to the adjoining property owner whose property will be rendered practically inaccessible. We regard it as clear that the abutters' right of access has been cut off by the building of the road and the necessary acts connected therewith, and not by the merely nominal act of the town board in attempting to fix the grade at the request and for the sole benefit of the street railway company.

There is, however, another question in the present case, which is much broader in its scope, and which is becoming a more pressing question every day; and that is the question whether passenger railroads operated by mechanical power can be laid over country highways without consent of, or compensation paid to, the adjoining landowner; or, in other words, Are they additional burdens to the fee? The development of electric railways and motors is so rapid that this question should, if possible, be settled, as the day is evidently not far distant when such passenger railways running from city to city will be numerous, and extend to all parts of the state. It is well settled that a horse railroad upon a city street, built upon grade, and for the carriage of passengers only, is not an additional burden. The drift and weight of authority in other states seem to be also that the operation of the road by electricity or other mechanical power does not change the nature of the road in this respect, although it is also held by some other courts that, if permanent erections in the street interfering with the right of access are necessary for the operation of the road, these may constitute an additional burden. This court, however, has not passed upon these questions; and, however they may be decided, the result would not necessarily determine the status of a country road in these respects.

That there are many and marked differences between the uses to which a city street is put and the uses to which a country highway is put cannot be denied; nor can it be denied that the uses contemplated when the land is taken vary widely, except that both are intended for purposes of travel. The street railway in its inception is a purely urban institution. It is intended to facilitate travel in and about the city, from one part of the municipality to another, and thus relieve the sidewalks of foot passengers and the roadway of vehicles. It is thus an aid to the exercise of the easement of passage; strictly, a city convenience, for use in

the city, by people living or stopping therein, and fully under the control of municipal authorities, who have been endowed with ample power for that purpose. This strictly urban character of the street railways remained practically unchanged for many years, and during these years the long line of decisions grew up recognizing the street railway as merely an improved method of using the street, and rather as a help to the street than as a burden thereon. Time, however, has made changes in conditions. New motive power has been discovered, and it is found that by its use an enlarged city street-car may profitably run long distances, and compete to some extent with the steam railway.. It is proposed to convert the city railways into lines of passenger transportation, covering long distances and connecting widely separated cities and villages, by using the country highways, and operating long and heavy coaches, sometimes made up into trains of several cars. Thus, the urban railway has developed into the interurban railway, and threatens soon to develop into the interstate railway. The small car which took up passengers at one corner, and dropped them at another, has become a large coach, approximating the ordinary railway coach in size, and has become a part, perhaps, of a train which sweeps across the country from one city to another, bearing its load of passengers ticketed through, with an occasional local passenger picked up on the highway. The purely city purpose which the urban railway subserved has developed into or been supplanted by an entirely different purpose, namely, the transportation of passengers from city to city over long stretches of intervening country. When this train or car, with its load of through passengers, is passing through a country town, it is clearly serving no township purpose, save in the most limited sense. It is very difficult to say that this use of a country highway is not an additional burden. It is built and operated mainly to obtain the through travel from city

to city, and only incidentally to take up a passenger in the country town. This through travel is unquestionably composed of people who otherwise would travel on the ordinary steam railroad, and would not use the highway at all. Thus, the operation of this newly-developed street railway (so called) upon the country road is precisely opposite to the operation of the urban railway upon the city street. It burdens the road with travel which would otherwise not be there, instead of relieving it by the substitution of one vehicle for many.

However we regard this development of the urban into the interurban railway, it seems utterly impossible and illogical to say that it is essentially the same in its purpose or effects as the mere street railway, which was held in the *Hobart Case* not to be an additional burden on the fee. The reasons given for that holding in that case either do not apply at all, or only in a very limited degree, to the interurban railway. The difference is not so much in the change of motive power as in the entirely different character of the use. Suppose a steam railway corporation were organized to carry passengers only from city to city, and should attempt to lay its track upon the country roads without compensation; is there any doubt but that it would be held that it could not do so? We think not. Our conclusion is that an interurban electric railway, running upon the highways through country towns, is an additional burden upon the highway. *Pennsylvania R. Co. v. Montgomery Co. Pass. R. Co.* 167 Pa. St. 62.

But it is said that a distinction should be drawn between a highway in close proximity to a city, or running between the city and a neighboring suburb, and the ordinary country road through a farming district. The suggestion is not without weight. There is much difference between the practical uses to which the two highways are generally put. The suburban highway very frequently approximates closely

to the city street.   But, as indicated at the outset of this opinion, the difficulty in drawing any clear line of demarkation between the two is very great.   If a line be drawn in one case upon the facts in that case, depending upon mere proximity, or upon the manner of use, or the density of population, or the prospect of rapid settlement, or upon all of these circumstances together, it cannot apply to any other case; and the question will always be one of doubt and embarrassment, leading to different conclusions in different courts.   Such a condition of the law is to the last degree undesirable.   The legislature, by ch. 175, Laws of 1897, has provided that such corporations may condemn lands necessary for their use, but has further provided that the act should not apply to streets in an incorporated city.   In thus clothing street railway companies with the power to condemn as to all property except streets within city limits, the legislature seems to have indicated its conclusion that the city line was the proper line of demarkation, and that within that line, at least, condemnation of a street was unnecessary.   While this legislative idea has no binding force in determining the question of additional burden, it may justly be considered by the court which is called upon to pass upon a question beset with so much difficulty.   If the line be fixed at the limits of the corporation, it will at least have the great merit of certainty, and be capable of unerring application.   Presumably the city limits include the entire urban area, and we feel, under all the circumstances, that it is the true and proper line.

We are not unmindful of the fact that the questions discussed in this opinion are vexed questions, upon which there has been much contrariety of opinion in the various courts of the country, and that the law is only in process of settlement, and must continue in that condition for years.   In endeavoring to draw the line between the public right of passage, upon the one side, and the rights of the private

Fred Miller Brewing Co. vs. Manasse.

owner, on the other, great care is manifestly needful that neither be sacrificed nor unduly magnified at the expense of the other.

We held in the case of *Chicago & N. W. R. Co. v. M., R. & K. E. R. Co.* 95 Wis. 561, that an electric railway for the carriage of passengers, freight, and express matter between cities constitutes an additional burden upon the highway in a country town through which it passes. We hold in this case that an electric passenger railroad upon a country highway falls under the same rule. Both holdings seem to us to be founded upon good reason as well as authority, and we believe them to be salutary and just.

*By the Court.*— Orders affirmed.