All concur with LOTT, Ch. C., except DWIGHT, C., dissenting.

Order reversed, and judgment on report of referee affirmed.

---

THE PEOPLE ex rel. HENRY HOTCHKISS, Appellants, *v.* THE BOARD OF SUPERVISORS OF THE COUNTY OF BROOME, Respondent.

A board of supervisors has power to rescind a resolution auditing and allowing a claim against the county upon discovery of mistake or error.

In the auditing of claims a board of supervisors acts in a legislative, not in a judicial, capacity, and may repeal or reconsider its action when found to have been erroneous.

*People* v. *Supervisors* (35 Barb., 308); *People* v. *Ames* (19 How., 551); *Supervisors* v. *Birdsall* (4 Wend., 453) and *Supervisors* v. *Briggs* (2 Den., 26) distinguished.

(Argued January 7, 1875; decided May term, 1875.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, in favor of defendant, denying a motion for a new trial and directing judgment upon a verdict.

This was a proceeding by mandamus to compel defendant to reassemble, audit, allow and pay to relator the sum of $6,300, with interest, in payment for volunteers alleged to have been procured by the relator under contract with defendant and credited to the county of Broome.

The facts appear sufficiently in the opinion.

*William H. Hyde* for the appellants. The board of supervisors was bound by its audit. (*People* v. *Suprs. Schenectady Co.*, 35 Barb., 408.)

*E. C. Moody* for the respondent.

REYNOLDS, C. The question in this case was mainly one of fact, and has been disposed of by the jury in favor of the defendant. The proceeding was by mandamus, to compel the defendant to audit and allow a claim of the relator alleged to exist against the county of Broome for $6,300. It is averred in the writ that in the month of January, 1865, the relator, in the defendant's employment, mustered into the service of the United States, under the then existing laws, nine three-years' men for the county of Broome, and which were credited to said county, for which the defendant agreed to pay the amount claimed, which was payable on the 1st of February, 1868. That the relator has fully complied with his contract, and the defendant has refused payment. This averment was put in issue, and the case was tried before Mr. Justice MURRAY and a jury, in the county of Broome, with the result before stated. Upon the trial it seems that the point chiefly litigated was whether the nine soldiers, on whose account the bounty was claimed, were actually mustered into the service of the United States and credited to the county of Broome. That they were mustered in and actually went into the service of the United States seems to be very clear, but whether they were credited to the county of Broome in such form as that the county had the benefit of the credit presents a question of more or less difficulty.

The enlistments were made under the proclamation of the president of the United States of the 19th of December, 1864, calling for 300,000 men, and it appeared on the trial that on the 13th of January, 1865, the board of supervisors of the county of Broome passed a resolution to the effect that the county treasurer be authorized to pay to each volunteer from this county under the call before named, on the presentation of the certificate of the provost marshall that such volunteer has been accepted and mustered into the service of the United States and credited to the county of Broome, $500 to volunteers for one year, $600 to volunteers for two years, and $700 for volunteers for three years. The further proceedings had by the board of supervisors material to the question now involved were, in substance, as follows: At the annual meeting held on the 24th of November, 1865, a claim of the relator for nine volunteers at $700 each was audited at $5,400, and on the twenty-seventh of the same month the resolution auditing the relator's account at $5,400 was reconsidered, and it was referred to a committee to ascertain whether the volunteers, for which the relator claimed pay, had been actually credited and allowed to the county of Broome, and the State bounty received by the county treasurer, and if such was found to be the fact, the committee were authorized to draw on the treasurer in favor of the relator for $5,400. At a meeting of the board the committee reported in favor of the claim, and the report was adopted, and a report was also made recommending the levy of a tax upon the county, and it may be assumed that tax was ordered to be levied. On the 4th of December, 1866, the board reconsidered the resolution allowing the claim of the relator, and referring the same back, and upon a report that the nine men in question had been transferred from Broome and credited to Chemung county, and that the city of Elmira had paid bounties for the same men, the board finally, on the 6th of December, 1866, rejected the relator's claim. I have thus particularly stated the action of the board of supervisors of Broome in respect to the claim in question, because it is insisted by the learned counsel for the

relator that the claim having been once audited by that body it had no power afterwards to rescind and annul its action in that regard, and if this claim is well founded it will dispose of the whole case in favor of the relator and render the consideration of various other questions unnecessary. The suggestion by the counsel for the defendant that the claim of the relator was never in fact audited by the board is, I think, without substantial foundation.

It is argued that, in auditing and allowing claims against the county, the supervisors act in a judicial capacity, and their powers are restricted like inferior judicial tribunals, who, having once given judgment, may not review or reverse their own action, even if erroneous, or grant new trials, unless especially empowered to do so by statute. In a very largely qualified sense, it may be true that in such matters the action of the supervisors is *quasi* judicial, but I think not in any such sense as renders an erroneous and improper audit or allowance incapable of correction by the body committing the error. Boards of supervisors are not judicial tribunals any more than is the legislature of the State to be regarded in any of its action a court of justice, although it may audit, allow or reject claims against the State, and in any case repeal or reconsider its action when found to have been erroneous. The board of supervisors are mere local legislative bodies, in many respects of limited power; but where they have jurisdiction, they may act for their county precisely as the legislature may act for the State. If they act without jurisdiction their acts are void, the same as is the action of the legislature when in violation of any provision of the Constitution. If having jurisdiction, if by fraud or falsehood, or any misconception of a fact, a wrong thing is done, there is no reason in law or morals or in public policy, why they may not, on discovering the error, at once correct it. There is no substantial reason for hampering such a body, in its power to correct its own errors and to do right, by applying to it the technical rules which pertain to Justices' Courts, and other inferior judicial tribunals, supposed to proceed according to the course of the common law, and whose

mere errors can only be corrected by a direct proceeding in review.

It, perhaps, proves nothing to say that if a party presenting a claim against a county having done no service, and having no right, whatever which the supervisors allow, their action is void, and it was so decided in *The People* v. *Lawrence* (6 Hill, 244). But they have power to audit and allow claims against their county, and of necessity they must determine what are and what are not proper claims, upon such facts as may be in some form presented. They may be imposed upon as to the fact, and if, thereupon, a fictitious claim is allowed, it can hardly be said there was any excess of jurisdiction, any more than if in any court an unjust judgment should be rendered upon the evidence of a false witness. In the last case supposed, we all agree that the remedy must be attained, if at all, by a direct proceeding in review, but in the others, there can be no such remedy if the action of the supervisors is simply judicial, for there is no known provision of law by which their action can be directly reviewed by writ of error or upon appeal. If, therefore, the action of the supervisors in auditing and allowing a claim against a county, upon false evidence, may not be corrected by them upon discovering the error, there appears to be no remedy in the law for the redress of such a wrong, perpetrated against the tax-payers of any county.

It has come to pass in our law that many inferior tribunals and officers clothed with powers to summarily act and operate upon the property and rights of others, such as assessors, commissioners of highways, and the like, have by the courts been shielded from the consequences of palpable misconduct by the cover of the judicial ermine. It has thus happened that town assessors, commissioners of highways, and even pathmasters in the several districts of a town (and many other inferior officers), have been regarded as exercising the judicial function, in that degree that forbade all inquiry into the propriety of their conduct or their motives in a civil action for an alleged wrong. This rule has become very obstinate, and, I think, very oppressive in many cases; and in the case of *The*

*National Bank of Chemung* v. *The City of Emira* (53 N. Y., 49) the Court of Appeals in one respect has greatly modified the objectionable and oppressive rule referred to.

The cases cited to sustain the position contended for do not, I think, give it much support. Assuming that the case of *The People* v. *The Supervisors of Schenectady* (35 Barb., 408) was correctly decided (in respect · to which there may be different opinions), it does not necessarily dispose of the present question. The question in that case related to the apportionment of taxes to be raised among several towns and wards of the county for the support of the government as to the supervisors should seem "equitable and just," and I think the learned judge who made the decision was very much influenced by the consideration of the injurious effect which the inconsistent action of a board of supervisors in the apportionment of taxes and one or more reconsiderations and reapportionments might have upon the public interests. It may very well be that the action of a board of supervisors upon such a subject, when had with due deliberation, should, for obvious reasons, be regarded as a finality, but no such reason can apply to the case of the allowance or rejection, under any misconception of fact, of the claim of one individual against a county, and I can see no propriety or necessity in any case of likening a board of supervisors to a Justice's Court or any other inferior judicial tribunal in respect to the finality of its action in all cases of a *quasi* judicial character. It is very likely that in many cases their proceedings should be regarded as irrevocable, but it is not because they are so far or at all to be regarded as inferior judicial tribunals, as in every proper sense they are a local legislative body, with powers limited by statute and bearing exact analogy to the legislature of the State, whose power in many respects is limited by the Constitution. The cases are very numerous and the principle perfectly well settled that where power to do a certain act is conferred upon a public officer or board of officers, and when action has once been had under the power, it is final and may not be repeated, reversed or annulled by the same officer or

body, however erroneous or unjust.   This principle was, I think, in fact, applied by the learned judge in the case above referred to, and as it seems to me with much greater force than the rigorous doctrine that inferior judicial tribunals have no power to disturb their own judgments when once deliberately pronounced.   The case of *The People* v. *Ames* (19 How. Pr. R., 551), which is one sometimes cited to show the incapacity of a board of supervisors to reconsider its action, simply illustrates the principle last referred to.   The question in that case arose under chapter 498 of the Laws of 1847, which provided that boards of supervisors might limit the number of county superintendents of the poor to *one*, and when no resolution to that effect was found the number should be *three*. In that case the supervisors, under the statute, had, by resolution, reduced the number of superintendents to one and afterwards undertook to increase them to three, and it was held that they had power to reduce the number of superintendents, and having exercised it, the power was spent, and they could not thereafter increase the number.

The case of the *Supervisors of Chenango* v. *Birdsall* (4 Wend., 453) involved simply the question that a controversy arose between a county treasurer and the board of supervisors, on a settlement of the former's accounts for a given period, whether the treasurer was bound to pay interest on a sum in his hands belonging to the county, and after a full discussion of the question the then supervisors relinquished the claim for interest and a subsequent board undertook to assert the relinquished claim by action, and it was held they were estopped by the action of their predecessors.   This decision only affirmed a very familiar principle of law, applicable as well to private persons as to public bodies, that a party making a claim for both the principal and interest of a debt, after consideration or by way of compromise receives the principal and relinquishes the interest, no action can afterwards be maintained for the recovery of the interest.

The case of the *Supervisors of Onondaga* v. *Briggs* (2 Denio, 26) was very fully considered in the Supreme Court

and in the Court for the Correction of Errors, and was an action to recover back moneys paid the defendant, as district attorney, alleged to have been demanded and received for illegal fees.    The accounts of the defendant, as district attorney, were regularly taxed by a Supreme Court commissioner, on notice to the chairman of the board of supervisors of the county of Onondaga, and regularly audited and allowed to him in every year, and the money paid him by orders drawn on the county treasurer.   It was held, reaffirming the decision in the same cause (2 Hill, 135), that the taxation of the district attorney's account, on regular notice, was a judicial act which could not be questioned in action against him by the county to recover back moneys received over and above his legal fees; and, further, that the determination of the supervisors in auditing and allowing such an account is conclusive upon the county.   It was further held that money voluntarily paid upon a claim of right could not be recovered back.    In such a case I have no doubt but that the decision of the supervisors, with full knowledge of all the facts, ought to be held conclusive, but it will be observed that Judge Bronson, in affirming the finality of the action of the supervisors in that case, says: " The defendant presented his accounts from time to time to the board of supervisors, which board has power ' to examine, settle and allow' all accounts chargeable against the county and to raise money to defray the same, and the board from time to time examined, settled, allowed and paid the accounts.  (1 R. S., 385, §§ 3, 4, p. 383; § 95, p. 367; § 4; 2 id., 753, § 12.)   These acts conclude the plaintiffs from maintaining this action upon two grounds: First, as adjudications of the matters made by a tribunal duly constituted for that purpose, having ample authority to decide; and second, as voluntary payments, without fraud and with full knowledge of the facts.   Either ground is a complete answer to an action to recover back the money." In another portion of the opinion, the same learned judge remarks: " If there was a good taxation that is an answer to the action; if there was not, then the plaintiffs have them-

selves audited and settled the accounts and paid the money, and that is an answer to the action, or rather two answers." It is thus apparent that the determination of that case did not proceed upon any idea that in allowing or disallowing accounts against the county, boards of supervisors were to be regarded as inferior judicial tribunals, and subject to the same rules. The rule of law was applied to the supervisors in that case, the same, precisely, as it would have been applied against any individual who had brought an action to recover back money paid under an analogous state of facts.

In the present case the supervisors, in the first instance, allowed the relators' claim upon a presentation of the fact showing that the nine men, for whom the bounty was claimed, had been duly credited to the county of Broome, and in that case it was very obvious that the claim was a just one to be paid by the county. It, however, turned out afterwards, so far as it appeared to the board of supervisors, that these credits of nine volunteers had been by the military authorities transferred, with the consent of the relator or his associates, from the county of Broome to the county of Chemung, and that they, or some of them, had received the bounty from the city of Elmira for these identical nine volunteers. Under this condition of things, the supervisors reconsidered their action and rejected the claim, as I think they had the power, and as it was their duty to do upon the fact as it appeared to them. If such power did not exist, I think it follows, of necessity, that there is no known way to relieve the county of Broome from the payment of bounties to volunteers for whom they had no credit, and for all of whom bounties were actually paid by the city of Elmira, or the county of Chemung.

Reaching this conclusion, it must now be assumed that the action of the supervisors respecting the relator's claim was conclusive upon neither party, and it is obvious that the issue of fact, tried at the Circuit, was framed upon this theory. The *mandamus* alleges, with the marked conciseness of an artistic special pleading, the contract with the relator, the performance and the breach. This the defendant meets, with a like regard

1875.]     PEOPLE ex rel. HOTCHKISS v. SUPERVISORS.     231

Opinion of the Commission, per REYNOLDS, C.

to intelligent pleading, with a flat denial of the alleged fact, and upon this issue the case went to the Circuit for trial before a jury. It is said that the relator did not plead the alleged estoppel, and for that reason it could not avail him in any event, but this was not necessary, for as an instrument of evidence it was, if an estoppel at all, just as available as if formally pleaded.

The relator gave in evidence all the proceedings of the board of supervisors in respect to his claim, but did not rest his case there, and gave further evidence relating to the entire transaction with the board of supervisors of Broome, and the defendant gave evidence tending to controvert some material facts claimed to exist on the part of the relator. I think the evidence is entirely clear, not only that the contract alleged was made, but that, in the first instance, the volunteers for whom the bounty was claimed were mustered into the service of the United States and credited to the county of Broome. It is, I think, equally clear that upon the refusal of the treasurer of Broome to pay the bounty demanded the very identical volunteers were transferred and credited to the county of Chemung, and the bounty actually paid by the city of Elmira which is now claimed by the relator. It is said, that having been once credited to Broome the rights of the parties were fixed and they could not, thereafter, be transferred to Chemung to the prejudice of the relator's rights. That may be on a given state of facts, but if the relator consented to the transfer, as the jury have found, he has no just cause of complaint, even if some of his associates have not done him full justice, as is probably the fact. After a careful examination of the evidence I think it was a question for the jury to say whether the transfer of these men from Broome to Chemung was or was not made with the knowledge, acquiescence or consent of the relator. The learned judge at the Circuit, I think, gave the case to the jury upon the evidence, with great clearness and impartiality, and said: "If it (the evidence) proves to your satisfaction that Hazard and Hotchkiss were a party to this transaction by which Mr. Layten transferred these credits and sold these men to the city of

Elmira, then they are bound by it and the relator in this case is not entitled to recover. If, on the other hand, as is contended by the relator, they, nor either of them, had any connection with this sale and it was entirely the act of Layten himself as a separate and independent transaction from any thing in which they were engaged, then the relator is entitled to recover," and under this direction the verdict passed for the defendant. I think the charge, in this respect, was too favorable to the relator, for, under the contract, the county was not required to pay, as I think, until there was a substantial credit for the number of men for whom the bounty was agreed to be paid. This credit was to be procured by the relator in performance of his contract, and if it was done and then undone by any action to which the supervisors were not privy, I do not see that the right of the relator was made out. But as the verdict of the jury was in favor of the defendant it is not material to pursue the subject.

The views above presented seems to render the consideration of any other of the minor questions in the case unnecessary, and it follows that the judgment of the Supreme Court must be affirmed, with costs.

All concur.

Judgment affirmed.