MARIE R. McCABE et al., Respondents, v. THE CITY OF NEW YORK et al., Appellants.

Streets — New York (city of) — when city not liable to abutting landowner for damages caused by change in grade of street — construction of charter of city of New York authorizing authorities of city to change streets or the grade of streets.

1. Where the property of an abutting owner is damaged by reason of an improvement in a public street, pursuant to lawful authority, a change in the grade of the street does not constitute a taking of property within the meaning of the Constitution, and the abutter is without remedy unless provision therefor is made by statute. Section 951 of the charter of the city of New York (L. 1901, ch. 466) provides that with a single exception therein set forth "* * * there shall be no liability of abutting owners for originally establishing a grade; nor any liability for changing a grade once established by lawful authority."

2. Section 442 of the charter of the city of New York provides: "The board of estimate and apportionment is authorized and empowered, *whenever and as often as it may deem it for the public interests so to do*, to initiate a change in the map of the city * * * and to change the grade of existing streets shown upon such map or plan." By this provision, legislative authority was conferred

upon such board to determine whether or not the interests of the public would be subserved by a change in the grade of existing streets, and the power of the legislature to delegate that authority to the city and the board cannot be questioned.

3. When the board of estimate and apportionment has determined, after due inquiry and consideration of the question, and has adopted resolutions, that a proposed change would subserve the public interest by the discontinuance of certain streets existing only as map streets, by a change of grade and the construction of work, having in view the abolition of grade crossings, the presumption is that such conclusion was reached in the exercise of a careful judgment, and it is not within the power of the judicial branch of the government to annul the determination of that legislative body and substitute its judgment therefor.

4. The courts cannot impute to the legislature any other than public motives by their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion that the professed motives for passing it are not the real ones, and the presumption that legislative action has been devised and adopted on adequate information, and under the influence of correct motives, will be applied to the discretionary action of municipal bodies, and will preclude all collateral attack.

5. In an action by the owner of unimproved property to recover for damages for change of grade of a street in the city of New York, where the findings of fact disclose that the board of estimate and apportionment, so far as its procedure was concerned, complied with all of the provisions of the charter, the conclusion of law that plaintiff is entitled to recover is not justified save in so far as it relates to an encroachment by the city upon plaintiff's property for a foundation wall.

*McCabe* v. *City of New York*, 155 App. Div. 262, modified.

(Argued November 12, 1914; decided January 12, 1915.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the second judicial department, entered February 15, 1913, affirming a judgment in favor of plaintiffs entered upon a decision of the court on trial at Special Term.

May 20th, 1907, Hannah A. McCabe became the owner of a certain piece of land in Long Island City, borough of

Queens, city of New York, situate on the northerly side of Thomson avenue, having a frontage thereon of seventy-five feet, and a frontage on Purvis avenue of one hundred feet. The property in question was and is vacant and unimproved.

Hannah McCabe died seized of said premises September 26th, 1910, and the plaintiffs herein succeeded to her ownership of the same. Thomson avenue is a street one hundred feet in width leading from Long Island City in an easterly direction out into Queens county, and has been used as a public street for a great many years. Title to the same was acquired by the public authorities in the year 1867, and was vested in the defendant, the city of New York, when the several acts complained of by plaintiffs occurred. Thomson avenue, near to the property of plaintiffs, runs practically east and west; Purvis avenue, a street about sixty feet in width, runs northerly and southerly and crosses Thomson avenue one hundred and one feet easterly from the southeasterly corner of plaintiff's land abutting Thomson avenue.

On and prior to June 27th, 1907, Thomson avenue was on a uniform level grade, theretofore lawfully adopted, of an average of nine and one-half feet over tide water datum, and during all of the time under consideration tracks of the Long Island Railroad Company, six in number, crossed Thomson and Purvis avenues at grade upon a right of way one hundred feet in width, said tracks being about one hundred and sixty feet distant from the southeasterly corner of plaintiffs' premises.

The defendant Long Island Railroad Company and the Pennsylvania, New York and Long Island Railroad Company proposed to construct and operate a terminus and terminal facilities, called "Sunnyside Yard," and a freight yard in the borough of Queens, in New York city, and applied to the city of New York to consent to the construction or improvement of the said terminus and terminal facilities, and likewise applied to the board of esti-

mate and apportionment of the city of New York to change the map and plan of the city of New York by altering, discontinuing and closing portions of streets and avenues, changing the grade on portions of streets and avenues, and to lay out portions of new streets in order that such terminus, terminal facilities and freight yard might be constructed and operated. Accompanying such application was a plan, dated June 11th, 1906, showing such proposed changes, and which provided for a terminus and freight yard extending from the northerly side of the original right of way of the Long Island Railroad Company at its intersection with Thomson avenue in an easterly direction about eight hundred feet. The length of said terminus was to be about two miles. The plan provided for the discontinuance of Thomson avenue over the width of said terminus and freight yard, and in lieu thereof for the carrying of Thomson avenue over said terminus and freight yard by means of a viaduct, and further provided for the elevation of the grade of Thomson avenue at the intersection of Thomson avenue with the northerly line of the terminus, from nine feet above high-water datum to thirty-two feet above high-water datum, and the bridge or viaduct along the line of Thomson avenue was to commence and be carried in an easterly direction along said avenue eight hundred feet, at various elevations, from thirty-two feet on the northerly line of the yard to forty-six feet at the apex or center, and at the southerly line of said yard to about seventeen feet, after which latter elevation said Thomson avenue returned to the original grade of said avenue, and on said original grade Thomson avenue continued southerly into Queens county. Said plans, referred to, further provided for the elevation of the grade of Thomson avenue along the seventy-five feet frontage which plaintiff's lands had on said Thomson avenue at seventeen and three-tenths feet.

The proposed plan having been presented to the board

of estimate and apportionment, that body, pursuant to the provisions of the charter, published notice of intention to consider the same, and thereafter and on February 15th, 1907, the board of estimate and apportionment adopted a preamble and resolution wherein was recited the first resolution, the publication of the notice to all persons interested, and that such public hearing was given to all persons who had appeared, and such proposed change having been duly considered by the board it determined, *"deeming it for the public interest* to change the map or plan of the city of New York by closing and discontinuing portions of certain streets, changing the grades of existing streets and laying out new streets" within the territory described, as shown upon the map submitted by the railroad companies, "and does hereby favor the same." Such resolution to be effective required the signature of the mayor, but action by him was to be deferred until the agreement which accompanied said plan had been executed by the parties thereto, which agreement was made between the city of New York and the Long Island Railroad Company June 27th, 1907, and by the terms of which the city of New York authorized and approved the construction of said terminus, terminal facilities and freight yard by the railroad companies, and the changes necessary to permit the improvements, including the closing of that portion of Thomson avenue lying between the northerly side of the right of way of the railroad company, which is one hundred and sixty feet easterly of the southeast corner of plaintiff's property and Meadow street easterly therefrom, and changing the grade of Thomson avenue in front of plaintiff's premises, and gave to the railroad companies the right to erect a viaduct on the line of Thomson avenue over the said terminus and freight yard, which viaduct was to be constructed and paved, including sidewalks thereon, and the change of grade made in Thomson avenue at the expense of the railroad companies.

Said agreement provided in substance that the structure was to be built and the work and acts performed as therein provided, "in order to provide a suitable terminus and suitable terminal facilities for the railroad of the (railroad) company and to facilitate the proper connection of the railroad of the Tunnel Company with the various lines of railroad of the Long Island Company and thus to provide better facilities for the accommodation of the traveling public and the freight and other traffic thereon and the operation of the said railroads, *and to avoid the crossing of certain streets at grade which are now crossed by the railroad of the Long Island Company,* * * *" and referred to the application made to the board of estimate and apportionment for the altering, discontinuing and closing of portions of streets and avenues, by changing the grades of portions of streets and avenues and by laying out portions of streets and avenues "in order that they [the railroad companies] might construct, maintain and operate the said terminus, terminal facilities and freight yard" as set forth in said application.

After the execution of the agreement the Pennsylvania, New York and Long Island Railroad Company was duly merged by agreement of consolidation with the Pennsylvania, New Jersey and New York Railroad Company and thereupon became the defendant Pennsylvania Tunnel and Terminal Railroad Company, and as such succeeded to all the rights and obligations of the original companies, proceeded with the work of construction of the viaduct and erected a structure of solid masonry by way of wall or embankment extending across the entire seventy-five feet of frontage of plaintiffs' premises upon said avenue, an average of seventeen and three-tenths feet in height.

The trial court also found that the elevation of the grade of Thomson avenue in front of plaintiffs' property and the construction of the wall and embankment were not made for street purposes or uses but for the purpose

of benefiting the defendant railroad companies; that the change of grade of Thomson avenue in front of plaintiffs' premises was made solely for the purpose of benefiting the railroad companies and was not made for the benefit of the public; that the use of said Thomson avenue for street purposes by the public did not require any change of grade in Thomson avenue in front of plaintiffs' lands; that in the construction of said wall the defendants had encroached upon the plaintiffs' property for the foundation thereof, for which an allowance was made in the sum of one hundred and fifty dollars; that the construction of said wall in front of plaintiffs' premises was unlawful, illegal and unauthorized and not for the public uses, and was an unlawful burden imposed upon said avenue and an infringement upon the plaintiffs' rights therein, and by reason thereof plaintiffs suffered damages in the sum of ten thousand seven hundred and ten dollars.

There are no tracks or other property of the defendant railroad companies on Thomson avenue in front of plaintiffs' premises. The surface of Thomson avenue in front of plaintiffs' property consists of a paved roadway with footpaths on either side extending the length of the avenue, which as regraded is used by the general public as a street for both pedestrians and vehicles.

*Frank L. Polk, Corporation Counsel* (*Clarence L. Barber* and *Terence Farley* of counsel), for City of New York, appellant. The change of grade in Thomson avenue was made for street purposes and in the public interest. (1 Lewis' Suth. on Stat. Const. § 84; 1 Dillon on Mun. Corp. [5th ed.] § 243; 2 Dillon on Mun. Corp. [5th ed.] §§ 573, 580; *Gilliwater* v. *Miss. Co.,* 13 Ill. 1; Cooley on Const. Lim. [7th ed.] 257, 264, 300; *Matter of City of New York,* 142 App. Div. 726; *Hopkins* v. *Swansea,* 4 M. & W. 621; *People ex rel.* v. *Delany,* 120 App. Div. 801; 192 N. Y. 533.) The question whether the change of grade was made in the public interest is not affected

by the ownership of the naked title to the old roadbed. (*Buffalo* v. *Pratt*, 131 N. Y. 293; *Matter of City of New York*, 196 N. Y. 286; *Matter of City of Buffalo*, 189 N. Y. 163; 221 U. S. 524; *People ex rel.* v. *Com. Council*, 128 App. Div. 44, 49; *Matter of City of New York*, 131 App. Div. 147; *Matter of City of New York*, 133 App. Div. 321; *Matter of Olean* v. *Steyner*, 135 App. Div. 341, 346; *Mayne* v. *Nassau R. R. Co.*, 151 App. Div. 75; *Sehenectady* v. *Trustee*, 144 N. Y. 241; *Conklin* v. *N. Y., O. & W. R. R. Co.*, 102 N. Y. 107.) As plaintiff's property was unimproved her rights are governed by the common law which gives no consequential damages for change of grade. (*Sauer* v. *New York*, 206 U. S. 536, 544, 547; 3 Dillon on Mun. Corp. § 1678; *Graves* v. *Otis*, 2 Hill, 466; *Wilson* v. *Mayor, etc.*, 1 Den. 595; *Benedict* v. *Goit*, 3 Barb. 459; *Adee* v. *Nassau R. R. Co.*, 65 App. Div. 529; *Bernhard* v. *City of Rochester*, 127 App. Div. 875; *Warner* v. *State of New York*, 132 App. Div. 611; *People ex rel.* v. *Stillings*, 136 App. Div. 438; 198 N. Y. 504; *Radcliffe* v. *Mayor, etc., of Brooklyn*, 4 N. Y. 195; *Uline* v. *N. Y. Central R. R. Co.*, 101 N. Y. 98; *Reiser* v. *Mayor, etc.*, 104 N. Y. 68; *Reining* v. *N. Y., L. & W. R. R. Co.*, 128 N. Y. 158.)

*Alton B. Parker* and *Albert B. Boardman* for Pennsylvania Tunnel and Terminal Railroad Company et al., appellants. The court erred in holding that the alteration of Thomson avenue was not a change of grade for a street use. (*Sauer* v. *City of New York*, 206 U. S. 536; 180 N. Y. 27; *Matter of Grade Crossing Commissioners*, 201 N. Y. 38; *People ex rel. Flaxman* v. *Hennessy*, 74 Misc. Rep. 167; *People ex rel. Hallock* v. *Hennessy*, 205 N. Y. 301; *Herbert* v. *County of Rockland*, 65 Misc. Rep. 358; *Matter of Rapid Transit Commission*, 197 N. Y. 99; *Conklin* v. *N. Y., O. & W. R. R. Co.*, 102 N. Y. 107; *Matter of City of New York*, 71 Misc. Rep. 485; *People ex rel. Simon* v. *Bradley*, 207 N. Y. 592; *Matter of Grade Crossing Comrs.*, 209 N. Y. 139.)

*Stephen O'Brien* and *Abraham Wielar* for respondents. The conclusions and judgment are sustained by findings which find and show that the changes in the streets were made for railroad purposes and not for public street purposes. (*Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81; *People ex rel. Simon* v. *Bradley*, 207 N. Y. 592; *Sweeting* v. *City of Rochester*, 127 App. Div. 880; 194 N. Y. 565; *Bernhard* v. *City of Rochester*, 127 App. Div. 875; 194 N. Y. 566; *Folmsbee* v. *City of Amsterdam*, 142 N. Y. 118; *Reining* v. *N. Y., L. E. & W. R. R. Co.*, 128 N. Y. 157; *Fuller* v. *City of Mount Vernon*, 171 N. Y. 247; *Archer* v. *City of Mount Vernon*, 171 N. Y. 364; *Mardin* v. *Dorthy*, 160 N. Y. 45.) The evidence shows the violation of every principle of law as to the rights of the public and abutting owners in public streets, and the violation of every statute regulating the manner in which the rights unlawfully given and acquired might have been lawfully acquired, and also shows that under the guise of exercising the power conferred by section 442 of the charter, the city and the railroads made an appropriation of our easement in the street, not for a street or public use, but to provide the railroads with a suitable terminus, terminal facilities and freight yard. (*Reining* v. *N. Y., L. & W. R. Co.*, 128 N. Y. 157; *City of Gary* v. *Much*, 94 N. E. Rep. 584; *Matter of Rapid T. R. R. Comrs.*, 197 N. Y. 81; *Simon* v. *Bradley*, 207 N. Y. 592; *Bacon* v. *N. C. R. Co.*, 164 N. Y. 289; *Smith* v. *B. & O. R. R. Co.*, 181 N. Y. 132; *Hutchinson* v. *State*, 39 N. J. 569; *Coster* v. *Tidewater Co.*, 18 N. J. Eq. 54; *Buchholz* v. *N. Y., L. E. & W. R. R. Co.*, 148 N. Y. 640; *Eels* v. *A. T. & T. Co.*, 143 N. Y. 133; *Donahue* v. *Keystone Gas Co.*, 181 N. Y. 313; *Matter of Ludlow Street*, 172 N. Y. 542; *Matter of City of N. Y.*, 204 N. Y. 465; *Johnson & Co.* v. *Cox*, 196 N. Y. 110.) Only under the Railroad Law, as amended in 1905, chapter 728, section 7, could our easement be acquired, and changes in the streets made, and embankments and approaches erected, to pro-

vide the railroads with the terminus and additional facilities and freight yard acquired here; and, unless done as provided by that law, they must be deemed to have been made without lawful authority and are, therefore, a nuisance, and the acts under which they were permitted illegal, *ab initio.* (*Simon* v. *Bradley*, 207 N. Y. 592; *L. I. R. R. Co.* v. *Sherwood*, 205 N. Y. 1; *Smith* v. *B. & O. R. R. Co.*, 181 N. Y. 132; *Matter of N. Y. C. & H. R. R. R. Co.*, 200 N. Y. 121; *People ex rel. N. C. R. Co.*, 164 N. Y. 289; *Matter of City of N. Y.*, 204 N. Y. 465; *Reining* v. *N. Y., L. E. & W. R. Co.*, 128 N. Y. 157; *Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81.) Public streets and an abutter's easements, without compensating him therefor, cannot be taken for enlarging railroad facilities by a declaration of public interest under section 442 of the charter; and such a declaration or the defense that the acts were done under municipal authority does not protect the city or the railroads from their unlawful acts. (Cooley Const. Lim. [7th ed.] 788; *Matter of Deanesville C. Assn.*, 66 N. Y. 569; *Reining* v. *N. Y., L. & W. R. R. Co.*, 128 N. Y. 157; *Forster* v. *Scott*, 136 N. Y. 577; 15 Cyc. of Law & Pro. 580, note 44; *Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81; *City of Gary* v. *Much*, 94 N. E. Rep. 584; *Shoemaker* v. *U. S.*, 147 U. S. 282; *Coster* v. *Tidewater Co.*, 18 N. J. Eq. 54; *Queens Terminal Co.* v. *Schmuch*, 147 App. Div. 502; *Matter of N. F. & W. R. Co.*, 108 N. Y. 375; *Matter of S. R. C. R. Co.*, 128 N. Y. 408.)

HOGAN, J. It is the settled law by numerous decisions of this court that where the property of an abutting owner is damaged by reason of work of an improvement in a public street, pursuant to lawful authority, a change in the grade of said street does not constitute a taking of property within the meaning of the Constitution, and the abutter is without remedy unless provision therefor is made by statute.

Section 951 of the charter of the city of New York, (L. 1901, ch. 466) the only statute called to our attention, provides in substance:

"* * * there shall be no liability to abutting owners for originally establishing a grade; nor any liability for changing a grade once established by lawful authority, *except* where the owner of the abutting property has subsequently to such establishment of grade built upon or otherwise improved the property in conformity with such established grade, and such grade is changed after such buildings or improvements have been made. * * *"

The property of plaintiffs was vacant and unimproved; plaintiffs did not own the fee in any part of the bed of Thomson avenue upon which their property abutted; a grade had been lawfully established on Thomson avenue for upwards of twenty years prior to 1907. It follows that if the work complained of by plaintiffs was in fact a change of grade of Thomson avenue and was carried on under express authority of law, a recovery for damages sustained by plaintiffs, other than for the encroachment of the foundation wall of the viaduct, cannot be sustained.

The trial justice found that the determination by the board of estimate and apportionment provided not only for a discontinuance and closing of certain streets but *for a change of the grades of portions of streets,* and for the discontinuance of Thomson avenue at grade over the width of the freight yard of the railroad companies, and in lieu thereof for the carrying of Thomson avenue over the freight yard by a viaduct, *and for the elevation of the grade of Thomson avenue along the seventy-five feet frontage which plaintiffs' lands had on said avenue;* that there had been a change of grade of Thomson avenue from a point thereof southwest of plaintiffs' premises, to a point where the grade of the avenue reached the original grade of the same; that the elevation of grade in front of plaintiffs' premises was for the purpose of an

approach to the viaduct (which viaduct was to commence at a point one hundred and sixty feet easterly of the southeast corner of plaintiffs' land).

That the city contemplated, provided for, and actually made a change of grade on Thomson avenue in front of the premises of the plaintiffs is an established fact found by the court in this case. It was that change of grade that physically affected the lands of the plaintiffs. In view of such fact, was the conclusion of the trial justice that the construction of the approach in front of plaintiffs' premises was unlawful, illegal and unauthorized, and not for a public use but an infringement upon the rights of the plaintiffs, justified?

The conclusions of the trial justice were based upon a construction of certain provisions of the agreement made between the city of New York and the railroad companies with reference to the work to be performed.

Section 442 of the charter of the city of New York provides: "The board of estimate and apportionment is authorized and empowered, *whenever and as often as it may deem it for the public interests so to do*, to initiate a change in the map or plan of the city of New York, so as to lay out new streets, parks, bridges, tunnels and approaches to bridges and tunnels and parks, and to widen, straighten, extend, alter and close existing streets, and to change the grade of existing streets shown upon such map or plan. * * * "

The findings by the trial justice disclose that the board of estimate and apportionment, so far as its procedure was concerned, complied with all provisions of the charter of the city of New York.

By the provisions of the charter above quoted, legislative authority was conferred upon the board to determine whether or not the interests of the public would be subserved by a change of the map and plan of the city of New York, the establishment of new streets and bridges, or a change in the grade of existing streets. The power

of the legislature to delegate that authority to the city and the board cannot be questioned. The exercise of the authority conferred involved a peculiar knowledge of the needs of the public, to be acquired only by minute investigation, coupled with the expression of the people who were invited by public notice, as required by the city charter, to attend the meetings at which the proposed change of plan was to be considered.

Concededly the tracks of the railroad company, six in number, crossed Thomson avenue at grade. It was the intention of the railroad companies to acquire land and construct additional tracks. Important questions were before the board for determination, viz.: Were the six tracks crossing the avenue a menace not only to the safety of the citizens using the highway, but alike to the public journeying upon trains operated across the same? Would the presence of additional tracks increase the danger to the public? Would danger be avoided and the public interests be advanced by the construction of an overhead crossing in the nature of a viaduct, involving a change of grade in a portion of the avenue, even though such construction and change of grade might prove of benefit to the railroad companies? The expenses incident to the change, the situation of property in the neighborhood, whether sparsely or thickly populated, the fact that streets proposed to be closed were merely map streets, and many additional considerations, were within the knowledge of the body dealing with the public needs of a great city.

The board of estimate and apportionment having determined, after due inquiry and consideration of the question, and having adopted resolutions that the proposed change would subserve the public interests by the discontinuance of certain streets existing only as map streets, change of grade and the construction of the work, having in view the abolition of grade crossings, the presumption is that such conclusion was reached in the exer-

cise of a careful judgment, and the question arises, was it within the power of the judicial branch of the government to annul the determination of that legislative body and substitute its judgment for the conclusions reached by the board empowered to decide the question of public interest.

In *People ex rel. Wood* v. *Draper* (15 N. Y. 532, 545) Chief Judge Denio wrote:

"There is room for much bad legislation and misgovernment within the pale of the Constitution; but whenever this happens, the remedy which the Constitution provides, by the opportunity for frequent renewals of the legislative bodies, is far more efficacious than any which can be afforded by the judiciary. The courts cannot impute to the legislature any other than public motives by their acts. If a given act of legislation is not forbidden by express words, or by necessary implication, the judges cannot listen to a suggestion that the professed motives for passing it are not the real ones." To the same effect are *People ex rel. Kemmler* v. *Durston* (119 N. Y. 569); *Waterloo Woolen Mfg. Co.* v. *Shanahan* (128 N. Y. 345).

In *People ex rel. Kemmler* v. *Durston* (119 N. Y. 569) the relator, who was confined under conviction for murder first degree, sentenced to death, sued out a writ of habeas corpus, alleging he had been sentenced to undergo a cruel and inhuman punishment (death by electricity) contrary to the Constitution. The county judge, before whom the writ was made returnable, over the objection of the attorney-general that the court had no authority to take proof to show that the statute defining the punishment was in conflict with the Constitution, appointed a referee to take such proofs. This court held that the county judge was in error; that it was his duty to remand the relator; that extraneous proof by expert or other witnesses was not admissible to show that the act of the legislature was in conflict with the Constitution. If it could

31

not be made to appear that the statute was in conflict with the Constitution by argument adduced from the language of the law itself or from matters which the court could take judicial notice of, then the statute must stand.

In *Waterloo Woolen Manufacturing Company* v. *Shanahan* the defendant, as superintendent of public works, entered into a contract on behalf of the state with the other defendants for the performance of certain work authorized by chapter 325 of the Laws of 1888 which stated that the money appropriated therein was to be applied to improvements on the Cayuga and Seneca canal toward dredging and excavating the channel of the Seneca river from its intersection with the said canal in the village of Waterloo to the Old Bear Race and thence toward dredging and excavating said race to Washington street in said village so as to admit passage of canal boats therein from said canal. The trial court admitted evidence over objection and found that Bear Race was private property, that the dredging to be done and improvements made were not part of the canal system; that the plaintiffs were entitled to the surplus water running through the canal; that the effect of the legislation was to take plaintiffs' property for private use and was, therefore, in conflict with the Constitution and directed judgment perpetually restraining the defendants from further prosecution of the work. This court held that while the judiciary had power to determine whether the use to which private property is to be devoted by legislative power is public or private, nevertheless, when the legislature appropriated money for improvements, then the scrutiny which the courts exercise must be confined to matter appearing on the face of the statute itself; that the private or local character of the expenditure did not appear on the face of the bill there under consideration, but from evidence admitted by the trial court against defendants' objection and exception, the court found as a matter of fact that

the improvement could not benefit the canal but would benefit the property of individuals, and, treating of that question, this court said: "Expenditures may in fact be improvident and the work may prove to be useless to the public, but the legislature, as the depository of the sovereign powers of the people, must necessarily be the judge of the propriety and utility of making it.   *   *   * The judicial department cannot institute an inquiry concerning the motives and purposes of the legislature, in order to attribute to it a design contrary to that clearly expressed or fairly implied in the bill, without disturbing or impairing in some measure the powers and functions assigned by the Constitution to each department of the government.   The courts cannot determine, upon the testimony of witnesses, that the purpose of the legislature was to appropriate public money for the benefit of an individual, when it has expressed its purpose in the bill itself to be the enlargement or improvement of the canal.   They must assume that the legislature acted in good faith and meant just what it said, although it may be possible to show, outside of the language and terms of the bill, that in fact all, or the larger part, of the benefits following the expenditure may or will be reaped by a few individuals." (p. 358.)

In Cooley's Constitutional Limitations (7th edition, page 257) the author says:

"From what examination has been given to this subject, (inquiry into legislative motives) it appears that whether a statute is constitutional or not is always a question of power.   *   *   *   In any case in which this question is answered in the affirmative, the courts are not at liberty to inquire into the proper exercise of the power. They must assume that legislative discretion has been properly exercised.   If evidence was required, it must be supposed that it was before the legislature when the act was passed; and if any special finding was required to warrant the passage of the particular act, it would seem that the

passage of the act itself might be held equivalent to such finding. And although it has sometimes been urged at the bar that the courts ought to inquire into the motives of the legislature where fraud and corruption were alleged, and annul their action if the allegation were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon."

The same author at pages 305, 306, says:

" And the same presumption that legislative action has been devised and adopted on adequate information and under the influence of correct motives, will be applied to the discretionary action of municipal bodies, and of the State legislature, and will preclude, in the one case as in the other, all collateral attack."

It has been held that boards of supervisors are mere local legislative bodies in many respects of limited power, but where they have jurisdiction, they may act for their county precisely as the legislature may act for the state. (*People ex rel. Hotchkiss* v. *Board of Supervisors*, 65 N. Y. 222.)

The legislature may also confer power upon common councils of cities to pass municipal ordinances, and such as are passed in pursuance of such authority are as obligatory as if enacted by the legislature itself. (*City of Buffalo* v. *New York, Lake Erie & Western Railroad Company*, 152 N. Y. 276.)

This subject is treated in Dillon upon Municipal Corporations (5th edition), volume 1, pages 458, 459, where the author, speaking of the power conferred upon municipal corporations, where a discretion in the manner in which the power will be used is conferred, said:

" Thus, where the law or charter confers upon the *city council, or local legislature, power to determine upon the expediency or necessity of measures relating to the local government,* their judgment upon matters thus committed to them, while acting within the scope of their authority,

cannot be controlled by the courts. In such case the decision of the proper corporate body is, in the absence of fraud, final and conclusive, unless they transcend their powers. Thus, for example, if a city has power to *grade streets*, the courts will not inquire into the necessity of the exercise of it, or the refusal to exercise it, nor whether a particular grade adopted, or a particular mode of executing the grade, is judicious. * * * So, also, where, by its charter, a municipal corporation is empowered, if it deem the public welfare or convenience requires it, to *open streets or make public improvements thereon*, its determination, whether wise or unwise, cannot be judicially revised or corrected."

Quotations from a number of text book writers upon the subject might be included in support of the principle cited, showing a uniformity of decision, which denies to the judiciary power to review legislative authority conferred upon a municipality and jurisdiction to determine a question reserved to the legislative body, where no attack is made upon the legislative act as being in conflict with the organic law.

While in some cases courts have permitted an inquiry to be made into the motives inducing action by municipal authorities, where they have been in an *administrative character*, still the rule has never been applied so far as I have been able to determine in a case where the municipal authorities act in a legislative character, and, even in cases where the action is taken in an administrative character, as was said by Judge O'Brien in *Talcott* v. *City of Buffalo* (125 N. Y. 280, 288):

"Whatever evils may exist in the government of cities that are due to mistakes, errors of judgment or the lack of intelligent appreciation of official duty, must necessarily be temporary, compared with the mischief and inconvenience which judicial supervision, in all cases, would ultimately produce."

Our determination is that the conclusions of law are

not justified by the findings of fact, save in so far as the encroachment of the foundation wall and coping upon the property of plaintiffs was concerned, for which an allowance was made to plaintiffs in the sum of one hundred and fifty dollars.

The Appellate Division laid stress upon the additional fact that the city was to part with its title to a certain portion of a street reserving only a perpetual easement in the same. In view of the conclusion we have reached it will be unnecessary to refer to that fact, especially as no finding was made by the Appellate Division, nor was any finding with reference to that fact made by the trial justice.

The judgment should be reversed and a new trial granted, costs to abide event, unless plaintiffs stipulate to reduce the judgment to the sum of one hundred and fifty dollars and interest from the date of the encroachment as found by the trial justice, together with costs of Trial Term and Appellate Division; in which event the judgment as thus reduced is affirmed, without costs to either party in this court.

COLLIN, J. (dissenting). The action is to compel the defendants to remove an embankment constructed by them upon the entire surface of the part of a street in front of plaintiffs' lot, whereby access to the lot from the street as existing was destroyed, and to recover the damages caused by it. It was tried without a jury. The judgment entered upon the decision of the court awarded to the plaintiffs damages in the sum of $10,860, and an injunction restraining the maintenance of the embankment, to become inoperative, however, upon the payment of the sum of the damages. It was unanimously affirmed by the Appellate Division. The appellants here assert that the conclusions of law of the trial court, to the effect that the embankment was illegally and without right constructed and constituted a continuing nuisance injurious

to the lot of the plaintiffs, did not have any support in the findings of fact and hence the judgment was illegal. I think they err.

The findings of fact, which we must accept as conclusive in view of the unanimous affirmance (*Hay* v. *Knauth*, 169 N. Y. 298), are in effect, so far as material: The street in question was Thomson avenue in the borough of Queens of the city of New York. Title to it was in the city. Prior to the construction of the embankment, the right of way of the defendants, railroad corporations, was one hundred feet in width, and the tracks thereon intersected it at grade. The distance upon the street between the right of way and the lot of the plaintiffs was one hundred and sixty-two feet. In 1907 the railroad corporations desired to institute a freight yard and terminus which in its length of two miles should intersect Thomson avenue and in its width of eight hundred feet should include that distance of Thomson avenue, or seven hundred feet in addition to the part occupied by its right of way and contiguous to the side of the right of way further from plaintiffs' lot. The project involved parts of many streets other than Thomson avenue, but further reference need not be made to them. In aid of the fulfillment of the desire, the railroad corporations applied to the city of New York to assist them in and to consent to the establishment of the terminus and submitted to the board of estimate and apportionment of the city their application that the board under section 442 of the charter of the city, hereinafter referred to, discontinue Thomson avenue through the distance of the eight hundred feet and in lieu thereof provide for carrying it, on its existing line, over the freight yard or terminus by means of a bridge or viaduct, in order that they might institute the freight yard and terminus. The map or plan of the railroad companies portraying the proposed terminus and desired changes in streets was submitted with the application. The board granted the application coincidently with and

in view of the execution of an agreement between the
railroad corporations and the city. The agreement recites
the desire of the companies to institute the terminus and
freight yard, the application of the railroad companies to
the board of estimate and apportionment to act as therein
requested, "in order that they may construct, maintain
and operate the said terminus, terminal facilities and
freight yard," the granting of the application to be effect-
ive when the agreement is executed, the intention of the
railroad corporations to acquire the titles by purchase or
condemnation to all the lands fronting upon the parts of
the streets to be closed and thereupon to purchase from
the city all the lands of the parts of the streets discon-
tinued and closed; and the parties agreed, among other
things, that the part of Thomson avenue in question
shall be discontinued and closed and sold and conveyed
by the city to the railroad corporations; that the rail-
road companies will construct at their own expense a
bridge or viaduct over the proposed freight yard and
terminal development on the line of Thomson avenue
as now existing, and indemnify the city against and
assume all liability accruing because of the closing
or changing of the grades of streets, or the construction
of the viaducts, of which that on the line of Thomson
avenue was one, and will cede to the city by proper
instruments in writing perpetual easements for the right
to maintain and control the viaducts for the purpose of
police regulation, and other control contemplated by the
city ordinances for the care of streets, excepting and
reserving, however, to the said companies the right to
construct and maintain such connections between them
and the property of the companies as shall not interfere
with the use of them for street purposes. The perform-
ance of this agreement, in so far as it relates to the lot of
the plaintiffs, resulted in the construction of a viaduct,
on the line of Thomson avenue, over the eight hundred
feet of freight and terminal yard of the height of thirty-

two feet above the displaced surface of the avenue at the exterior line of the right of way nearer to plaintiffs' lot, thence rising to the height of forty-six feet, and of a solidly built approach to the viaduct, occupying the entire width of the avenue in front of the lot, and being along the seventy-five feet frontage thereof an average of seventeen and three-tenths feet higher than the surface destroyed by it.

Certain findings of fact are:

"*Twenty-sixth*. That the elevation of the grade of Thomson Avenue in front of plaintiffs' property, and the construction of the wall and embankment in front thereof, as hereinbefore found, were not made for street purposes or uses, but said elevation of grade and said wall and embankment were made necessary by reason of the construction of the viaduct over said terminus and freight yard.

"*Twenty-seventh*. That the change of grade of Thomson Avenue in front of plaintiffs' property was made solely for the purpose of benefiting the defendants' railroad companies, and their predecessors, and said change of grade was not made for the benefit of the public, and the use of said Thomson Avenue for street purposes by the public did not require any change of the grade of said Thomson Avenue in front of plaintiffs' lands."

It is further found as a fact that the construction of the viaduct and the erection of the wall in front of plaintiffs' lands were permitted by the defendant city to be and were done to promote and further the railroad enterprises and to provide terminal railroad facilities for the convenience and benefit of the railroad companies. The appellants assert that the findings thus quoted are conclusions of law. The finding that an act or a series of acts are done in order that an intended object or result shall be accomplished is a conclusion of fact. No principle of law applied to those acts compels it. It springs from the evidence declaring the acts

and declarations of the parties and the conditions then existing, and is a secondary fact established by those primary facts. Those findings must be accepted by us as conclusive.

Section 442 of the charter of the city of New York (L. 1901, ch. 466) provides: "The board of estimate and apportionment is authorized and empowered, whenever and as often as it may deem it for the public interest so . to do, to initiate a change in the map or plan of The City of New York, so as to lay out new streets, parks, bridges, tunnels and approaches to bridges and tunnels and parks, and to widen, straighten, extend, alter and close existing streets, and to change the grade of existing streets shown upon such map or plan," by proceeding as it prescribes.

The defendants had neither lawful authority nor power to discontinue and change the physical grade of Thomson avenue unless this section gave them.

While the viaduct is, probably, the property of the railroad corporations (*People ex rel. Buffalo & L. E. T. Co.* v. *Tax Comrs.*, 209 N. Y. 502), it is not necessary to determine with certainty the rights and conditions resulting from the agreement and its performance. For the purposes of this case, it and the approaches may be deemed the grade of that part of Thomson avenue as physically changed by the board of estimate and apportionment. There is no view more favorable to the claims made by the defendants. Inasmuch as the lot of the plaintiffs was not built upon or otherwise improved, the section of the charter awarding damage for change of grade (section 951) does not apply. Under the common law of nearly all jurisdictions, damage caused to an abutter by a lawfully authorized change of the grade of a street by the municipal authorities is *damnum absque injuria.* The courts by manifold declarations have recognized that the law frequently causes hardship and deprivation of property, and revealed their attempts in many cases to

escape it, yet deem it too fundamental and revered to annul. In *Matter of Torge* v. *Village of Salamanca* (176 N. Y. 324, 327) Judge CULLEN wrote for the court: "The hardship of this rule, however, was early appreciated and legislation was passed to secure abutters who improved their property on the faith of the established grade of a street from alteration of that grade without compensation." In a number of the states the constitutions, and in a greater number statutes, have abrogated or ameliorated it. There remain, however, in the application of the law, in this as in all cases involving damage from a change of street grade, the questions, was the change authorized and was it lawfully effected? The right of ingress and egress between a lot and the contiguous street is a property right, the unauthorized interference with which by a change of the grade of the street is illegal and wrongful.

The reason for the rule of the common law as stated is clear and certain. The easements or titles of the public streets and highways are held by the state for the people for the purposes of travel and traffic on the part of the public, and affording light, air and access to the property of abutting owners. (*Eels* v. *American T. & T. Co.*, 143 N. Y. 133; *Matter of Board of Rapid Transit R. R. Comrs.*, 197 N. Y. 81.) The people have the right, as a governmental function, at all times to improve or grade them for highway purposes as the travel over them necessitates or prompts, and abutters are conclusively presumed to have acquired their lands subject to this right, and have been compensated for any future improvement or change of grade for the legitimate purposes of streets. (*Sauer* v. *City of New York,* 180 N. Y. 27; *Conklin* v. *N. Y., O. & W. Ry. Co.*, 102 N. Y. 107.) The essence, however, of the rule is that the change of grade is made for legitimate street purposes. It is not a governmental function, as this court has repeatedly held, to authorize the erection in the streets of

structures to be used for other than strictly street purposes, or to change their grades, to the injury of abutters, for the accommodation or advantage of individuals or private corporations; nor are abutters presumed to have been compensated for such uses. The public interest which may lawfully impel and guide municipal authorities in altering, under a provision like unto that of section 442 already quoted, the grades of highways or streets, whereby the rights of abutters are molested, is the interest of the traveling public. A learned and discriminating writer has expressed his conclusion in this language: "The doctrine that the rights of abutting owners are subject to the right of the public to grade and improve streets, is one which has often resulted in great hardship to individuals. This is a reason why the doctrine should be restricted so far as is consistent with sound legal principles. The doctrine is founded upon the theory that when a street is established there is taken into consideration the fact that future improvements of the street may necessitate a change in the surface and the land is supposed to be given, or compensation made, with this in view. But it is manifest that only ordinary changes of grade can be thus anticipated, that is, such changes as may be necessary to secure a uniform, even surface for the purpose of facilitating traffic on the street. Consequently the rule should not apply when the reason of it fails. Consequently the rule should not apply where the grade is changed for some ulterior purpose not connected with the improvement of the street, or when made necessary by artificial conditions such as a railroad, canal or bridge." (1 Lewis on Eminent Domain [3d ed.], § 138.)

In *Reining* v. *N. Y., Lack. & W. R. Co.* (128 N. Y. 157, 166, 168) the common council of the city of Buffalo granted the defendant the right to construct an embankment for its railroad upon a part of Water street which interfered with the access to the premises of the plaintiff fronting

thereon. Judge ANDREWS, writing for the court, stated that the city of Buffalo, for the convenience and presumably upon the application of the defendant, devoted the center of Water street to what is practically the exclusive use of the defendant, leaving for the use of the plaintiffs a narrow and inconvenient roadway, separated from the center of the street by a barrier therein, and said: "We think the public cannot justly demand such a sacrifice of private interests, or justify such an appropriation of a street by a municipality in aid of a railroad enterprise.  *  *  *  It is quite probable that the general interests of Buffalo and of the larger public are promoted by this appropriation of the street, but it by no means follows that a lot owner whose property is injured should bear the loss for the public benefit;" and speaking of the plenary power given the city of Buffalo to change the grade of its street and the claim of defendant that the act under review was a change of the grade of Water street, said: "The fact that what was done did effect a change in the grade of that part of the street occupied by the embankment does not prove that what was done was in the execution of the power to alter the grade of streets conferred on the council. The primary object of this power contained in municipal charters, *is to enable the municipal authorities to render a street more safe and convenient for public travel, to afford drainage, in short, to adapt it more perfectly for the purposes of a public way.* It is claimed that the city under this power could lawfully authorize an embankment in part of the street, leaving the other part on a lower level. We are not called upon to say whether there is any limit to the exercise of municipal authority or that the city cannot in exercising the power to establish and alter the grade of streets, raise an embankment in a part of a street, *if, in its judgment, this will promote the public convenience and the purposes of the street as a highway.* But we think it cannot, under the guise of exercising this

power, appropriate a part of a street to the exclusive, or practically to the exclusive use of a railroad company, or so as to cut off abutting owners from the use of any part of the street in the accustomed way, without making compensation for the injury sustained." The doctrine of the elevated railroad cases is that a right of property in the street belongs to the abutting owner which cannot be injured or taken away from him without compensation by the erection of obstructions not essential to the normal use and condition of the street as such. The easement of the public is the right to use and improve the street for the purposes of a street only. A street purpose is exclusively a highway purpose and any use of the street, which improves or benefits it as a highway, is a proper street use. (*Matter of Rapid Transit R. R. Comrs.*, 197 N. Y. 81, 97.)

In *Ranson* v. *City of Sault Ste. Marie* (143 Mich. 661) a bridge was built by a private corporation, rendering services to the public, under a contract between it and the city, above the grade of the street, when for the purposes of the street only it might have been constructed at substantially the grade of the street. The approach to the bridge raised the grade in front of plaintiff's property. The city was held liable for the damage, and the court said: "The general power over streets, their grades and maintenance, and over bridges and the manner in which they shall be constructed, which is usually possessed by cities and is possessed by defendant city, *must be considered with reference to, and is limited by, the purposes and uses of public ways.*"

In *City of Shawneetown* v. *Mason* (82 Ill. 337) the city raised, under legislative authority, the grade of a street upon which the property of the defendants in error fronted, for the purpose of making it operative as a levee. The city had plenary power to establish and change the grades of streets, and thereunder justified its action. It was held that while a city may lower or elevate the

grades of its streets at its pleasure, when it is done in good faith, *with a view to fit them for use as streets to meet the public wants,* without compensation to abutters, the elevation of the street was made to protect the city against inundation from the Ohio river, and was not within the power, conferred by charter, to change the grades of streets, and said: "When the street was laid out, there is nothing to show that this was one of the anticipated uses to which it was to be devoted, and it cannot, therefore, be assumed that, when lot owners purchased, they purchased with the view that this levee might be constructed where it is. It is an appropriation of the street to a new use, we concede, legitimate enough in itself, but still a use not implied from the laying out of the street, and it cannot be intended lot owners have, by anticipation, compensated themselves against loss resulting by reason of its erection, as in the case of the change of grades in streets properly." It is true that in this case the constitutional provision of the state entitling owners to compensation for property damaged as well as taken was invoked, but this does not affect the decision that raising the grade of the street for levee purposes was not a change in grade within the meaning of the charter of the city, because it was not for legitimate street purposes.

In *Central of Georgia Ry. Co.* v. *Garrison* (12 Ga. App. 369) the grade of the street in the city of Athens upon which the property of the defendants in error fronted was lowered. This was done by the plaintiff in error railway company under a contract between it and the city and as a part of a general scheme beneficial to terminal facilities of the railway company and also the city. It was held that where a railway company, with the consent of the municipal authorities, undertakes to alter the condition of streets for the purpose of benefiting itself, although the change in the grade of the street may be of benefit generally to the public, it was not a change

of grade within the authorization of the charter of the city, and the abutter injured in the right of access may recover the damage from the city or the railway or both. Of identical effect is the decision in *Walters* v. *City of Baltimore* (120 Md. 644).

In *Egerer* v. *N. Y. C. & H. R. R. R. Co.* (130 N. Y. 108) the part of a street in the city of Rochester, in front of plaintiff's premises, was in part discontinued under an act of the legislature for the purpose of enabling the defendant to elevate its tracks. There was left but a narrow space between the embankment placed therein and plaintiff's premises. It was held that neither the legislature nor the city could alter, in connection with and in furtherance of the convenience and advantages of the defendant's railroad, the street injuriously to plaintiff's right of access without compensation to her.

In *Sauer* v. *City of New York* (180 N. Y. 27, 31) a second street was constructed by the city of New York under express legislative authority over the original street, in order to connect streets upon opposite and separated heights or bluffs. The additional street rested upon iron columns placed in the original street upon which plaintiff's property fronted. We held that the second roadway was constructed, in accordance with express legislative authority, for normal street purposes, and plaintiff could not recover consequential damages, and Judge Haight in his opinion said: "The rule may be different as to pecular and extraordinary changes made for some ulterior purposes other than the improvement of the street, as for instance, where the natural surface has been changed by artificial means, such as the construction of a railroad embankment or a bridge over a railroad making elevated approaches necessary."

Reference is also made to the following decisions: *Bernhard* v. *City of Rochester* (127 App. Div. 875; affirmed, 194 N. Y. 566); *Dean* v. *Ann Arbor Railroad Co.* (137 Mich. 459); *Zehren* v. *Milwaukee El. Ry. & L.*

*Co.* (99 Wis. 83); *Atchison, Topeka & Santa Fe R. R.
Co.* v. *Davidson* (52 Kans. 739).

Under principle and authority, the discretionary and
plenary authority given by section 442 of the charter to
the board of estimate and apportionment to change the
grade of existing streets can be lawfully exercised, as to
abutters, only in the interest and behalf of the people as
travelers and users of the streets or highways as such.
Of course, its exercise is not barred by the fact that
advantage will incidentally result therefrom to individ-
uals or private corporations. The easement of access
appurtenant to an abutting lot is continuous, and is
vested in the owner of the lot until the people deem that
it to a greater or less extent is required for increasing the
convenience or usefulness of the street for the traveling
public. The Constitution forbids that it should be taken,
under the guise of a change of grade by the authorities,
for the purpose and object of creating an opportunity for,
or promoting or advantaging any private undertaking or
enterprise or any public one other than an improvement
of the street.

In the present case the railroad companies set in
motion municipal functions for their own benefit and to
effectuate their private ends and designs. They desired
Thomson avenue through the distance of eight hundred
feet discontinued and the viaduct and approaches erected
for their own and sole interest. They constructed them
in their own interest and not in the interest of the public.
They were not intended to be and were not made for the
improvement of the avenue as a street, and the interest
of the people as proprietors and users of the street did not
require them. Neither the board of estimate and appor-
tionment nor the city possessed lawful authority to per-
mit or cause them.

The assertion of the city that the physical change of
grade of Thomson avenue was made for street purposes
because it did away with the grade crossing is without

32

merit. It contradicts the findings of fact. It was not made for and was not limited to that purpose. It is a matter of common observation and knowledge that a highway crossing above the tracks as they existed would not have needed a structure approximating even the height of thirty-two feet or an approach approximating the height or length of that constructed — indeed it may well be presumed that it would not seriously have interfered with the right of the plaintiffs. There is no finding that it was the intention of the railroad companies to acquire land and construct additional tracks for any purpose other than to enable them to establish the freight yard and terminus as proposed in the application submitted to the board of estimate and apportionment and the city and the plan accompanying it, or that any question was before the board other than the one, shall the companies be permitted to establish the yard and the streets be changed as they requested in order that they might construct the freight yard and terminus. An unauthorized change of grade makes those who effect it responsible for the damage to an abutter who is injured in his property rights. (*Folmsbee* v. *City of Amsterdam*, 142 N. Y. 118.)

The judgment should be affirmed, with costs.

WILLARD BARTLETT, Ch. J., HISCOCK, CHASE, MILLER and CARDOZO, JJ., concur with HOGAN, J.; COLLIN, J., reads disenting opinion.

Judgment accordingly.