90 N.Y.2d 1 (1997)
681 N.E.2d 312
659 N.Y.S.2d 145
Soon Duck Kim et al., Appellants, et al., Plaintiffs,
v.
City of New York, Respondent, et al., Defendants.
Court of Appeals of the State of New York.
Submitted January 7, 1997
Decided February 18, 1997.
Richard S. Graver, White Plains, for appellants.
Paul A. Crotty, Corporation Counsel of New York City (Jane L. Gordon and Barry P. Schwartz of counsel), for respondent.
Chief Judge KAYE and Judges BELLACOSA and LEVINE concur with Judge CIPARICK; Judge SMITH dissents and votes to reverse in a separate opinion in which Judge WESLEY concurs; Judge TITONE taking no part.
*3 CIPARICK, J.
In 1990, the City of New York regraded a public road in Queens. To maintain lateral support between the road and plaintiffs' property, the City placed side fill on the portion of plaintiffs' property abutting the roadway. In this lawsuit, plaintiffs contend that they are entitled to compensation for the portion of their property taken by the City. We disagree.
Plaintiffs acquired their property with constructive notice that the property abutted a public road that was below the legal grade. In regrading the road and raising a portion of *4 plaintiffs' property up to the legal grade, the City acted pursuant to a long-standing common-law principle and in conformity with a provision of its Charter that was in force when plaintiffs acquired title to their property. Therefore, we conclude that the City did not take any property interest from plaintiffs for which compensation is due.

I.
In June 1978, the now-defunct New York City Board of Estimate raised the legal grade of a section of College Point Boulevard in Queens from 9.1 to 13.5 feet. In October 1978, a map reflecting that legal grade was properly filed in the office of the Queens Borough President. Ten years later, plaintiffs purchased a parcel of property on College Point Boulevard, on which they currently operate a car wash and lease space to an auto repair shop. When plaintiffs purchased the property, the grade of their parcel was more than four feet below the legal grade. Plaintiffs had constructive notice of this feature by virtue of the filed map.
As part of a public construction project on College Point Boulevard in 1990, the City undertook to raise the roadway to its legal grade. In March of that year, the City's Department of Transportation gave plaintiffs written notice of the plan to raise College Point Boulevard to the previously established legal grade and advised plaintiffs of their obligation under the City Charter to raise their property to the legal grade (see, NY City Charter § 2904 [2]). The notice informed plaintiffs that the City would regrade the property at no cost to them upon receiving their consent within 10 days, but that if consent was not timely received, the City was authorized to do the work itself and seek reimbursement for its cost from plaintiffs. Plaintiffs failed to respond to the notice.
The City regraded the relevant portion of College Point Boulevard in June 1990. On account of the nearly five-foot disparity between the legal grade of College Point Boulevard and the lower grade of plaintiffs' property, the Department of Transportation raised plaintiffs' property to the legal grade by placing side fill on 2,390 square feet of plaintiffs' property abutting the public roadway. It is undisputed that the side fill was necessary to support the street and prevent erosion.
Plaintiffs had previously commenced this action in March 1990, alleging, among other things, that the City's regrading project would work an unconstitutional taking of their property *5 without just compensation.[1] Plaintiffs moved and the City cross-moved for summary judgment on the takings claim. Supreme Court denied plaintiffs' motion and granted the City's cross motion, concluding that because the City was authorized by New York City Charter § 2904 to compel plaintiffs to raise their property to the legal grade, no taking had occurred. The Appellate Division affirmed. After the parties stipulated to discontinue all causes of action other than the takings claim, we granted leave to appeal and now affirm.

II.
Plaintiffs contend that the City's action in placing side fill on almost 2,400 square feet of their property constitutes an unconstitutional taking of a portion of their property without just compensation. In support of this contention, plaintiffs invoke the rule that any government-authorized "permanent physical occupation" of property is a taking, no matter how small the area occupied and without regard to the public interest served by the government's action (with the magnitude of the occupation factoring only into the amount of compensation due) (see, Loretto v Teleprompter Manhattan CATV Corp., 458 US 419, 426-428). If this case involved simply the City's dumping of side fill on 2,400 square feet of plaintiffs' property, we might well agree with plaintiffs and the dissent, and conclude that there was a taking (see, Pumpelly v Green Bay Co., 13 Wall [80 US] 166, 181 [taking found where water overflow from dam permanently flooded landowner's property]; Matter of Cheese-brough, 78 N.Y. 232, 238 [taking found where City constructed permanent drain on landowner's property]; but cf., Loretto v Teleprompter Manhattan CATV Corp., supra, 458 US, at 440, n 19). However, that is not this case. We conclude instead that, by virtue of the common-law and City Charter obligation of lateral support to a public roadway, plaintiffs' title never encompassed the property interest they claim has been taken.
Central to the analysis of the issue on appeal is the settled proposition that "[p]roperty interests * * * are not created by the Constitution. Rather, they are created and their dimensions *6 are defined by existing rules or understandings that stem from an independent source such as state law" (Board of Regents v Roth, 408 US 564, 577). Because the State defines the rights and obligations that constitute "property" in the absence of any superseding Federal law, the threshold step in a takings inquiry is to determine whether, in light of the "`existing rules or understandings'" of State law, plaintiffs ever possessed the property interest they now claim has been taken by the challenged governmental action (Lucas v South Carolina Coastal Council, 505 US 1003, 1030 [quoting Board of Regents v Roth, supra, 408 US, at 577]). As explained by the Supreme Court in Lucas, the purpose of this "logically antecedent inquiry into the nature of the owner's estate" is to determine whether the allegedly taken property interest was a stick in the "bundle of property rights" acquired by the owner (505 US, at 1027, supra). Only if the claimed property interest inhered in the owner's title does the court proceed to determine whether the challenged governmental action works a compensable taking of that property interest (see, e.g., Penn Cent. Transp. Co. v New York City, 438 US 104, 123-125).
A threshold inquiry into an owner's title is generally necessary to the proper analysis of a takings case, whether of a regulatory or physical nature (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1028-1029 ["Where `permanent physical occupation' of land is concerned, we have refused to allow the government to decree it anew (without compensation), no matter how weighty the asserted `public interests' involved, Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S., at 426  though we assuredly would permit the government to assert a permanent easement that was a pre-existing limitation upon the landowner's title"]). Thus, regardless of whether this case is characterized as a physical or regulatory taking, a question we do not reach,[2] our analysis starts with a search into the bundle of rights and concomitant obligations contained in plaintiffs' title.
*7 It has been suggested that this "logically antecedent inquiry" into the owner's title should be limited to a review of those property and nuisance rules recognized at common law, and that statutory law should not factor into the analysis (see, e.g., K & K Constr. v Department of Natural Resources, 217 Mich App 56, 63-64, 551 NW2d 413, 417-418; Kmiec, At Last, the Supreme Court Solves the Takings Puzzle, in Callies [editor], Takings: Land-Development Conditions and Regulatory Takings After Dolan and Lucas, at 110-112). Some confusion in this respect stems from the Supreme Court's emphasis on the nuisance doctrine in Lucas to illustrate the type of background restriction of State law that would inhere in a property owner's title (see, e.g., Lucas v South Carolina Coastal Council, supra, 505 US, at 1029 [property owner's title contains the restrictions on use that "could have been achieved in the courts * * * under the State's law of private nuisance, or by the State under its complementary power to abate nuisances that affect the public generally"]). However, we do not think that this aspect of the Lucas opinion should be read so narrowly.
Given the theoretical basis of the logically antecedent inquiry  namely, "the State's power over * * * the `bundle of rights' that [property owners] acquire when they obtain title" (Lucas v South Carolina Coastal Council, supra, 505 US, at 1027)  we can discern no sound reason to isolate the inquiry to some arbitrary earlier time in the evolution of the common law. It would be an illogical and incomplete inquiry if the courts were to look exclusively to common-law principles to identify the preexisting rules of State property law, while ignoring statutory law in force when the owner acquired title (accord, Hunziker v State, 519 NW2d 367, 371 [Iowa] [no taking when statutory restriction on use of land was in effect when plaintiffs acquired title], cert denied 514 US 1003; Grant v South Carolina Coastal Council, 319 SC 348, 353-354, 461 SE2d 388, 391 [same]). To accept this proposition would elevate common law over statutory law, and would represent a departure from the established understanding that statutory law may trump an inconsistent principle of the common law (see, e.g., Gombert v McKay, 201 N.Y. 27, 30). As the Supreme Court has aptly observed:
"A person has no property, no vested interest, in any rule of the common law. That is only one of *8 the forms of municipal law, and is no more sacred than any other. Rights of property which have been created by the common law cannot be taken away without due process; but the law itself * * * may be changed at the will, or even at the whim, of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the common law as they are developed, and to adapt it to the changes of time and circumstances" (Munn v Illinois, 94 US 113, 134).
The corpus juris of this State comprises constitutional law, statutory law and common law. To the extent that each of these sources establishes binding rules of property law, each plays a role in defining the rights and restrictions contained in a property owner's title. Therefore, in identifying the background rules of State property law that inhere in an owner's title, a court should look to the law in force, whatever its source, when the owner acquired the property (see, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 N.Y.2d 603 [decided today] [enforcement of preexisting statutory wet-lands restriction not a taking]; Matter of Anello v Zoning Bd. of Appeals, 89 N.Y.2d 535 [decided today] [enforcement of preexisting steep-slope ordinance not a taking]).[3] In this case, we find applicable rules in the common law and in New York City's Charter.

*9 III.
Plaintiffs' obligation to preserve and maintain the legal grade has its roots in New York's common-law obligation of lateral support. In Village of Haverstraw v Eckerson (192 N.Y. 54), the Court discussed this obligation and distinguished between the lateral-support obligations of adjoining private landowners and the lateral-support obligation of a private landowner abutting a public roadway, noting that the landowner's duty with respect to the public roadway "will be somewhat broader" than the duty owed to an adjoining private landowner; indeed, the obligation was said to run in only one direction  "the municipality is not under a similar obligation to the abutting owner" (id., at 59).[4] Elaborating on the broad scope of this duty, the Court explained that "the preservation of lateral support to a highway, as constructed and prepared for the public use, is an obligation to the community, which rests upon the adjacent landowner. It is an absolute right of the public, in the maintenance of which the members of the community are concerned" (id., at 59; see also, 1 Rasch, New York Law and Practice of Real Property § 20:23, at 616 [2d ed] ["the fee owner of land abutting on a highway is under an obligation to preserve the lateral support to a public highway"]).
The dissent's reliance on authorities discussing the separate and narrower obligation owed to a neighboring private landowner is misplaced (see, dissenting opn, at 22 [citing Restatement (Second) of Torts § 817; 1 Am Jur 2d, Adjoining Landowners, § 40]). For example, the rule that the obligation of lateral support only prohibits "the withdrawal of the support of any land naturally necessary to maintain another's land in its natural condition" (dissenting opn, at 22) does not apply when a public roadway is involved. As explained in one treatise: "An exception to the general rule that the absolute right to support extends only to the land in its natural state occurs when the supported land is an adjacent public highway. The duty to provide lateral support includes the duty to support *10 the highway in its improved condition. The courts have held that the public interest in highways justifies the enlargement in the scope of duty" (9 Powell, Real Property ¶ 699 [1], at 63-6 [emphasis added]).
Nevertheless, we need not define the precise contours of the common-law duty in this case, because the property owner's obligation of lateral support to a public roadway finds its specific, contemporary formulation in the New York City Charter, which provides:
"The owner of any property at his own cost, shall * * * fill any sunken lot or lots comprising part or all of such property or cut down any raised lot or lots comprising part or all of such property whenever the transportation department shall so order pursuant to standards and policies of the transportation department * * *. In the event that the owner fails to comply with the provisions of this section, the transportation department may provide for the doing of same at the expense of the owner in the manner to be provided by local law" (NY City Charter § 2904 [2]; see, L 1992, ch 813, § 2).
Under this section, the property owner's obligation to "fill any sunken lot" is juxtaposed with the related obligation to "cut down any raised lot" (NY City Charter § 2904 [2]). Together, these provisions embody the rule that the landowner must maintain lateral support to the roadway. According to the dissent, however, property can only be considered "sunken" when "something has happened to the lot in question which might * * * require repair," and, therefore, a property owner's City Charter obligation to raise the property is not triggered "when it is the City that has caused the disparity." (Dissenting opn, at 21, 23.) We do not construe the statute so narrowly and conclude that section 2904 applies to this case because the City raised the roadway up to the legal grade that was established before plaintiffs acquired their property.
While acknowledging that one accepted meaning of the term "`sunken'" is "`situated or lying on a lower level,'" the dissent contends that section 2904 contemplates only the "primary meanings" of the term, which are "`having sunk or been sunk beneath the surface'" and "`having sunk to a lower level'" (dissenting opn, at 20-21 [quoting Random House Webster's *11 College Dictionary 1339 (1991)]).[5] However, in view of its juxtaposition with the term "raised," we believe the term "sunken" has the more general meaning of "situated or lying on a lower level" (see also, Webster's New World Dictionary 1427 [2d ed] ["sunken" defined as "below the level of the surrounding or adjoining area"]). This definition, considered in light of the broad common-law obligation of lateral support to a public roadway, supports the conclusion that a "sunken" lot, for purposes of section 2904, is one that is below legal grade. Moreover, this construction best serves the statutory purpose of supporting the roadway and protecting it from erosion, as well as abating the substantial safety hazard posed by drop-offs between the roadway and abutting properties.
The applicability of section 2904's lateral-support obligation to the facts of this case  where a property owner acquires property on notice of a legal grade different from the existing grade  is illustrated by this Court's analysis in Laba v Carey (29 N.Y.2d 302, 311-312). In Laba, the Court addressed the marketability of title of a property on which the existing grade of the public sidewalk was lower than the legal grade. Rejecting the purchaser's argument that this defect rendered title unmarketable, the Court explained in a particularly instructive passage:
"Although there is no present violation, respondents contend that they may be required in the future to raise the level of the sidewalk. This is nothing more than a normal incident to the ownership of real property within the City of New York. Section 230 of the New York City Charter [the predecessor provision to section 2904] places the responsibility for the maintenance and repair of sidewalks on the individual owner. This must be done in accordance with such specifications as may be prescribed by the Transportation Administration. Thus, if title is unmarketable here, then so is all property similarly situated within the city. This is manifestly not so" (29 NY2d, at 312, supra [emphasis added]).
*12 In this case, the City Charter obligation of lateral support to the legal grade of a public roadway  "a normal incident to the ownership of real property within the City of New York" (Laba v Carey, supra, 29 NY2d, at 312)  was in force when plaintiffs bought their property. In addition, plaintiffs acquired their property with constructive notice that the existing grade was below the legal grade, which had been duly established by the filing of a revised city map in accordance with statutory procedure (see, Administrative Code § 25-101 ["The city map is to be deemed final and conclusive with respect to the location, width and grades of the streets shown thereon, so far as such location, width and grades have been duly adopted"]).
Thus, plaintiffs acquired a "sunken lot" insofar as it was below the legal grade of the road and, accordingly, took the property subject to the section 2904 obligation to raise it to the legal grade (see, Trubia v Koch, NYLJ, Aug. 15, 1979, at 13, col 1 [Sup Ct, Queens County], affd 87 AD2d 742).[6] Moreover, plaintiffs were on notice that if they failed to discharge their obligation, the City could perform the work at their expense and on the public's behalf. Plaintiffs' deliberate noncompliance with this obligation cannot be converted into their present takings claim (see, Hoeck v City of Portland, 57 F.3d 781, 787-788, supra [no taking when City entered plaintiff's property to demolish abandoned structure: "if Hoeck had obeyed the City's order to repair the structure * * *, it would not have been necessary for the City to enter his property to enforce its regulations"]).[7]
The thrust of the dissenting opinion is that the City did not meet its burden to demonstrate that City Charter § 2904 applies *13 to this case (see, dissenting opn, at 21, 25). Even assuming that plaintiffs demonstrated a prima facie takings claim by showing that the City added side fill to their property, the City clearly discharged its burden to rebut plaintiffs' case by establishing that, pursuant to section 2904, plaintiffs never owned the property interest they claim was taken (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1031-1032). The City relied on section 2904 at each phase of this action and brought to each court's attention the 1979 case of Trubia v Koch, in which Supreme Court held and the Appellate Division affirmed that section 2904 applies when a landowner acquires property that is below the legal grade (see, Trubia v Koch, supra, at 13, col 2 ["Under the statutory authority, instead of placing the fill on petitioners' property at its own expense, the City could have compelled the petitioners, at their own expense, to fill the property to legal grade"]).
We are mindful of the concern expressed by the dissent that government might attempt to proffer novel interpretations of State law to justify what would otherwise amount to an unconstitutional taking. To guard against this possibility, the Supreme Court explained that only those rules derived from an "objectively reasonable application" of preexisting State law can be said to inhere in a property owner's title (see, Lucas v South Carolina Coastal Council, supra, 505 US, at 1032, n 18).[8] Thus, while the dissent might plausibly disagree with the Court's interpretation of section 2904, its concession that the statute "is amenable to two differing yet reasonable interpretations" (dissenting opn, at 21) forecloses its contention that the application of the statute in this case works a taking of plaintiffs' property.
Finally, when plaintiffs purchased the property, an inquiry would have revealed the disparity between the existing grade and the previously established legal grade. Plaintiffs' potential lateral-support obligation, then, presumably would have been factored into the purchase price of the property.[9] Consequently, if plaintiffs were to succeed on their takings claim, they could *14 receive the windfall of initially receiving a reduction in the purchase price on account of this obligation and subsequently receiving compensation when the obligation is enforced. Such a result is inconsistent with the basic purpose of takings law, which is to protect the private landowner from unfair fiscal burdens that should be shared by the public as a whole (see, Armstrong v United States, 364 US 40, 49), not to enrich the landowner at the public's expense.
In sum, we conclude that the lateral-support obligation imposed on plaintiffs was a prevailing rule of the State's property law when they acquired their property and, accordingly, encumbered plaintiffs' title and the constituent bundle of rights. The City's enforcement of this legal obligation therefore does not constitute a taking of any property interest owned by plaintiffs for which they are entitled to compensation. When plaintiffs acquired title to their property in 1988, they acquired ownership of the entire parcel, including the portion abutting the public roadway, subject to the obligation to maintain lateral support to the roadway's legal grade. Today, plaintiffs still own the entire parcel, including the portion abutting the roadway, subject to the obligation to maintain lateral support to the roadway's legal grade. The only difference between then and now is not that a property interest has been taken, but that the preexisting lateral-support obligation has been enforced by the City itself because plaintiffs refused to do so.
Accordingly, the judgment appealed from and order of the Appellate Division brought up for review should be affirmed, with costs.
SMITH, J. (dissenting).
When the City put side fill on plaintiffs' property to shore up a roadway, it took their property for public use and plaintiffs are entitled to be compensated for the taking. Contrary to the instant interpretation of the majority, neither the New York City Charter nor the common law is a preexisting limitation on plaintiffs' title that would authorize a taking of plaintiffs' property without compensation. I, therefore, dissent.
Under the reasoning of the majority, plaintiffs must suffer *15 "the City's dumping of side fill on 2,400 square feet of plaintiffs' property" (majority opn, at 5) solely to create additional lateral support that will "protect" and "maintain" an artificially created roadway dedicated to the public. The majority finds the physical invasion complained of to be permissible under section 2904 of the New York City Charter and as an extension of a landowner's obligation to provide such support for public roadways.
In 1978, the Board of Estimate raised the legal grade of College Point Boulevard from 9.1 to 13.5 feet. A portion of that public roadway abutted a lot at 31-25 College Point Boulevard which plaintiffs purchased in 1988. Because a map reflecting the legal grade had previously been duly filed in the office of the Queens Borough President, plaintiffs arguably were on constructive notice that their property was approximately 4.5 feet short of the legal grade of the adjacent roadway.
In 1990, work finally began to regrade the roadway. Construction on the street included installing a new sewer system and water main. In March 1990, plaintiffs filed the instant action against the City alleging that due to the "reconstruction of street" abutting their property, "the highest and best use of the property has been diminished resulting in a taking" by the City. Later that same month, following completion of the sewer system and water main installation, the City's Department of Transportation (DOT) requested plaintiffs' "consent" to "permit the placing and sloping" of side fill on plaintiffs' property to "protect" and "maintain" the street.[1]
Although DOT offered to perform the construction at no charge if consent were timely returned, DOT warned that it *16 would proceed even without consent, "the cost of which shall be due and payable and shall constitute a lien against your property." The notice stated that plaintiffs would "be responsible for the removal and relocation of landscaping, fences, walks, stairs and other structures, whether or not they are attached to a building, which may be disturbed due to fill operations." The notice further provided that any consent to the placement of side fill on plaintiffs' property "in no way constitutes a waiver of or release from your obligation to construct and/or maintain the sidewalk abutting your property pursuant to Section[s] 2903 & 2904 of the New York City Charter." Plaintiffs never responded to the notice.
The regrading of the roadway began in June 1990. Rather than leave an almost five-foot disparity between the lower grade of plaintiffs' property and the neighboring roadway, the DOT proceeded to dump side fill on that portion of plaintiffs' property that abutted the roadway (about 2,390 square feet) until the two were level. The DOT also built permanent driveway ramps from College Point Boulevard to plaintiffs' property which provided greater roadway access. The driveway ramps were built at no cost to plaintiffs. Following the regrading project, plaintiffs filed a notice with the New York City Comptroller for a "claim for damages by reason of a change of grade" pursuant to title 3, §§ 3-316 through 3-320 of the Administrative Code of the City of New York.
The plaintiffs moved for summary judgment and an order directing an immediate trial on damages on the takings claim against the City. The City cross-moved for summary judgment in its favor. Supreme Court denied plaintiffs' motion but granted the City's cross motion and dismissed the plaintiffs' claim. In so holding, the court stated that plaintiffs' claim must fail because "the City could have compelled plaintiffs to fill the property to legal grade at their own expense pursuant to New York City Charter § 2904."
The Appellate Division affirmed and held that the side fill did not constitute a "permanent physical occupation" and plaintiffs' property rights "were not effectively destroyed by *17 the City's actions." (204 AD2d 711.) The Appellate Division held that no taking had occurred because "the fill was necessary to support the street and prevent erosion, and there is no evidence that the placement of the fill had an impact on the plaintiffs' business or their use of the property" (id.).
In affirming the order of the Appellate Division, a majority of this Court adopts the reasoning of Supreme Court and holds that "the City did not take any property interest from plaintiffs for which compensation is due" because the "City acted pursuant to a long-standing common-law principle and in conformity with a provision of its Charter that was in force when plaintiffs acquired title to their property." (Majority opn, at 4.)
Contrary to the view of the majority, the placing of side fill on the plaintiffs' property constituted a taking of private property for public use which requires compensation. Moreover, neither the common law nor section 2904 of the New York City Charter supports the argument of the majority.
In Loretto v Teleprompter Manhattan CATV Corp. (458 US 419), the plaintiff filed a takings claim against the placement of cable television equipment on her roof pursuant to a statute which provided that "a landlord may not `interfere with the installation of cable television facilities upon his property or premises'" (458 US, at 423). The Court found in favor of the plaintiff. However, the Court distinguished the "permanent physical occupation" by the cable equipment in that case from permissible regulations affecting a property owner such as the requirement to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers and the like.
Respondents argue that the "lateral support" obligation here falls within the latter category of permissible regulations. However, the regulations described by the Loretto Court are all directed toward the public safety and health of those persons invited to the landowner's property by the landowner. They do not benefit the public-at-large. In the present case, the plaintiffs' personal property and obligations are dedicated to the public benefit without regard to plaintiffs' property interests. Indeed, the Loretto Court recognized this distinction when it stated that the statute at issue there "might present a *18 different question" if it required landlords to provide cable installation if a tenant so desired (458 US, at 440, n 19).[2]
Importantly, the Loretto Court reiterated the rule that "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve" (458 US, at 426). The long-standing application of this rule is undeniable. In 1879, this Court stated that "there never can be any necessity under the police power or the law of necessity to permanently appropriate land to the public use without compensation" (Matter of Cheesebrough, 78 N.Y. 232, 237). More recently, the Supreme Court stated that "[i]n general (at least with regard to permanent invasions), no matter how minute the intrusion, and no matter how weighty the public purpose behind it, we have required compensation" (Lucas v South Carolina Coastal Council, 505 US 1003, 1015).
In Matter of Cheesebrough (78 N.Y. 232, supra), a property owner charged that newly enacted legislation to provide for proper drainage of lands within New York City was unconstitutional because the law made no provision for compensating the owners for the land taken for the "acquisition of an easement" in lands for the construction and maintenance of drains. This Court agreed and stated:
"It was a work not so much necessary for the lands of the petitioner as for other lands requiring drainage through his. It is believed that no case can be found justifying the permanent appropriation of land without compensation under such circumstances. * * * The statute * * * did not and no statute could confer authority to construct this drain through the land of the petitioner without his consent and without compensation to him for the land taken" (id., at 238).
Such is the rule even where the legislation "did not deprive the owner of the fee and gave the public but an easement" (People ex rel. Williams v Haines, 49 N.Y. 587, 590; see also, People ex rel. Cook v Nearing, 27 N.Y. 306).
*19 Although government may not decree land anew such that a permanent physical occupation may be sustained without compensation, the Supreme Court has noted that government may assert a "permanent easement that was a pre-existing limitation upon the landowner's title" (Lucas v South Carolina Coastal Council, 505 US, at 1028-1029; see also, Matter of Gazza v New York State Dept. of Envtl. Conservation, 89 N.Y.2d 603 [decided today]). Clearly, a "pre-existing limitation" may not be based upon subsequently enacted legislation or novel interpretations of State law (see, Lucas v South Carolina Coastal Council, 505 US, at 1029 ["Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership"]).
Obviously, the placement of enough side fill across 2,400 square feet of plaintiffs' land to raise it almost five feet higher is a physical invasion. Moreover, there can be no argument that the invasion is temporary in any way. Thus, the placing of side fill on the plaintiffs' property constituted a taking. Accordingly, under the guidance of Lucas, the circumstances presented here may only be validated without compensation if respondent can show that a "pre-existing limitation" upon plaintiffs' title may be found in State law (505 US, at 1031).
In Lucas, the Supreme Court advised that a showing of "background principles" of property law that may create such a preexisting limitation upon title must stem from more than "the conclusory assertion" of "a common-law maxim such as sic utere tuo ut alienum non laedas" (505 US, at 1031; see, Black's Law Dictionary 1380 [6th ed] ["one should use his own property in such a manner as not to injure that of another"]). Contrary to the instruction of the Supreme Court, the majority holds that a newly expanded obligation under that same common-law principle provides a basis for validating the permanent physical occupation at issue here.
Neither New York City Charter § 2904 nor the common law supports the argument of the majority. Section 2904 devolves from section 230 which became part of the City Charter in 1962. The two sections, 2904 and 230, do not differ in any material respect. What is significant is that the legal grade of the street was changed in 1978, well after the enactment of section 230. In other words, when section 230 became law, there was no indication that it would be applied to require a private property owner to shore up this or any other public roadway.
*20 Section 2904 of the City Charter defines certain landowner obligations under the auspices of the transportation department such as maintaining sidewalks. Whether the statute is truly the "contemporary formulation" of the common-law lateral support obligation as noted by the majority is certainly open to debate (see, e.g., City of Rochester v Campbell, 123 N.Y. 405, 412 [no obligation to repair streets or sidewalks rests upon lot owners at common law]; Village of Fulton v Tucker, 3 Hun 529, 531-532 ["The owner of adjoining territory has no greater duty in regard to keeping sidewalks in repair, than he has in regard to other parts of the highway"]). Moreover, the statute does not address the circumstances here. The provision reads, in relevant part:
"Duties and obligations of property owner with respect to sidewalk flags, fencing of vacant lots and filling of sunken lots or cutting down of raised lots. The owner of any property at his own cost, shall * * *
"(2) fence any vacant lot or lots comprising part or all of such property and fill any sunken lot or lots comprising part or all of such property or cut down any raised lot or lots comprising part or all of such property whenever the transportation department shall so order pursuant to standards and policies of the transportation department. In the event that the owner fails to comply with the provisions of this section, the transportation department may provide for the doing of same at the expense of the owner in the manner to be provided by local law."[3]
The plain language of section 2904 refers to "sunken" lots.[4] The majority's position necessarily hinges upon an interpretation of this term. While "sunken" may mean "situated or lying on a lower level," its primary meanings are listed as "having *21 sunk or been sunk beneath the surface" or "having sunk to a lower level" (Random House Webster's College Dictionary 1339 [1991]). The Second Edition of the Oxford English Dictionary provides several definitions of the word, only two of which are relevant. One definition is "that has sunk below the usual or general level, subsided" (see, 17 Oxford English Dictionary 197 [2d ed]). Another meaning is given as "In modern technical use, applied to a surface area lowered, or to an object let in, so as to lie below the general surface, or to work of which depression of level is a general feature." Clearly, plaintiffs' land may not be characterized as "sunken" under the latter definition. Thus, the primary definition of the word "sunken" implies that something has happened to the lot in question which might therefore require repair (see, Italian Sav. Bank v Le Grange, 169 App Div 120, 123, 125 [referring to "low and swampy" ground which new purchasers filled as "sunken lots"]). Such a reading comports with the traditional lateral support obligation.[5]
The reference to "sunken lots" is amenable to two differing yet reasonable interpretations. Notably, the majority fails to offer a shred of legislative history to support its interpretation of this ambiguous phrase. Instead, the majority offers a meaning that is inconsistent with the same common-law principle which the majority contends is the root of the provision itself. Under Lucas, the respondent must offer some specific support, from any source whatsoever, that the City Charter has ever been applied in this manner. No such evidence comes from respondent, the party with the burden of proof to demonstrate that background understandings of State law serve to create a preexisting limitation on plaintiffs' title.
The protections guaranteed under the Constitution do not support the majority's decision to read a statute that is, at best, ambiguous in such a way as to do away with the traditional right to property. This interpretation to validate an otherwise impermissible taking is clearly "beyond what the *22 relevant background principles would dictate" (Lucas v South Carolina Coastal Council, 505 US, at 1030).[6]
The doctrine of lateral support restricts the withdrawal of the support of any land naturally necessary to maintain another's land in its natural condition (Restatement [Second] of Torts § 817; 1 Am Jur 2d, Adjoining Landowners, § 40). As stated in Hay v Cohoes Co. (2 N.Y. 159), "it is better that one man should surrender a particular use of his land, than that another should be deprived of the beneficial use of his property altogether, which might be the consequence if the privilege of the former should be wholly unrestricted" (2 NY, at 161).
This common-law principle is limited to the support of land in its natural state when asserted by owners of adjacent property. Nevertheless, in the case of a public roadway, the common-law obligation is extended to include the sustenance of lateral support for even the artificially created street. As stated in Finegan v Eckerson (26 Misc 574), "although, as claimed by the defendants, the right to lateral support between adjoining owners does not include the right to the support of an artificial structure, that doctrine has no application to the case of a highway" (id., at 575). While a certain amount of excavation might be permissible when land is in its natural state, the added pressure of an artificial structure will further limit what an adjoining landowner might do (see, Milburn v Fowler, 27 Hun 568, 569-570; 3 Warren's Weed, New York Real Property, Lateral and Subjacent Support, § 2.04 [1] [4th ed]).
The majority cites Village of Haverstraw v Eckerson (192 N.Y. 54) as authority for its position that the common law does not permit compensation here. The case is not applicable. While *23 the majority relies upon Village of Haverstraw to create plaintiffs' obligation to raise their own land to the legal grade of the street, the express holding of that case is that a landowner could not do certain acts upon his own property that would injure a public street. As the Court concluded:
"My conclusion is that, whether the acts of persons menace the condition of a highway in a direct manner, or indirectly, by so digging, or excavating, upon the adjacent lands as to affect the lateral support and to cause, or to threaten, the subsidence of the highway, the exercise of the equitable power of the court may, properly, be invoked by the municipality in restraint of their continuance" (192 NY, at 60).
Thus the Haverstraw Court says nothing about the placing of side fill on property without the owner's consent or about any compensation due an owner as a result. The holding in Haverstraw simply applies the general obligation of lateral support to a roadway, an artificial structure which would not fall under an ordinary application of the doctrine (see, Adlin v Excelsior Brick Co., 129 App Div 713, 715 ["It is not disputed that the rule of lateral support binds the owner of land along a highway, and that if he wrongfully excavate so close as to cause the highway to cave in he is liable for any damage caused thereby"]; Milburn v Fowler, 27 Hun 568, 570, supra [one may not dig on his own land "so as to cause a subsidence or destruction of the highway itself"]; City of Troy v Murray, 128 Misc 419, 421 [defendant "has no right to further threaten the destruction of the streets in question, as the removal of sand and gravel has now reached the point that further excavation will result in the caving in of the streets at some points"]).
However, the majority reads the "contemporary formulation" of the lateral support obligation much more broadly than any of our authorities have ever seen fit to do. Under the facts of this case, the City merely regraded a roadway, thereby rendering the area higher than plaintiffs' property. The "existing understanding" of the obligation of lateral support clearly does not apply here when it is the City that has caused the disparity. Moreover, there is no indication that the common-law doctrine of lateral support negates plaintiffs' fundamental property interest in resisting a permanent physical occupation *24 by the City.[7] Indeed, where a change in the grade of a public street led to damage to property, this Court has approved compensation to plaintiff only for a physical encroachment for a foundation wall (McCabe v City of New York, 213 N.Y. 468). General damage to the property due to the regrading was not compensable.
Clearly, this common-law principle does not support the proposition advanced by the majority. As the Supreme Court held in Pumpelly v Green Bay Co. (13 Wall [80 US] 166):
"for a consequential injury to the property of the individual arising from the prosecution of improvements of roads, streets, rivers, and other highways, for the public good, there is no redress * * * But we are of opinion * * * that it remains true that where real estate is actually, invaded by superinduced additions of water, earth, sand, or other material, * * * it is a taking, within the meaning of the Constitution" (13 Wall [80 US], at 180-181).
The ultimate question a court must answer upon a "taking" claim is whether government action inevitably forces property owners "alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole" (Armstrong v United States, 364 US 40, 49). The majority seems to argue that there has been no taking here because plaintiffs never had unrestricted title to the portion of the premises on which side fill was placed. The argument appears to be that the New York City Charter and the common law both prevented plaintiffs from having unrestricted title to this portion of the premises as part of the bundle of rights they acquired (see, Matter of Gazza v New York State Dept. of Envtl. Conservation, supra).
The argument fails. Simply, adjoining property owners do not have an obligation under the common law to encumber their property for the lateral support of a raised road. Although the referenced provision of the City Charter sets forth certain obligations of a landowner which were not required under the common law, such obligations do not reach the circumstances here. Other than general language regarding the "broader" obligation to support an adjacent roadway by property owners, *25 the interpretation of the City Charter advanced by the respondent and adopted by the majority finds no support as part of the "existing rules or understandings" of property law before this litigation.
While the majority characterizes the arguments presented herein as a "narrow" reading of the law, the interpretation is consistent with the authorities and evidence submitted by the respondent. It is the majority that expands the existing obligations under State property law beyond the limits that such law has heretofore been interpreted. The fact that the respondent has the burden to prove the result reached by the majority is especially troubling when one considers the substantial difference between the preservation of existing support and the obligation to create the level of additional support necessary under the circumstances. Indeed, under the subject City Charter provision, plaintiffs are required to suffer a permanent physical invasion of their property and pay for any direct property damage as well as the costs for respondent's construction  construction that would, ordinarily, constitute a compensable taking.
Allowing the City to justify the permanent physical occupation of part of plaintiffs' property on the basis of a spontaneous construction of the common law and a City Charter provision would be allowing the City, "`by ipse dixit, [to] transform private property into public property without compensation'" (Lucas v South Carolina Coastal Council, supra, 505 US, at 1031, quoting Webb's Fabulous Pharmacies v Beckwith, 449 US 155, 164). The result reached by the majority is precisely the situation the Supreme Court refused to sanction in Lucas.
Finally, an easement on plaintiffs' property was not created when the City filed the map raising the legal grade of the street (see, Nollan v California Coastal Commn., 483 US 825, 833, n 2). However, that filing may have thereafter limited the ability of plaintiffs to construct improvements on their property at any grade other than the legal grade (see, People ex rel. Architects' Offs. v Ormond, 201 App Div 787, 792, affd 234 N.Y. 549; Matter of Mellilo v Kracke, 261 App Div 631, 634). Until the City actually raised the grade of the street, however, it would have been impossible to determine the extent of any necessary taking of the property of plaintiffs or any other adjoining landowners.
In sum, plaintiffs have suffered a permanent physical occupation which constitutes a taking. The judgment appealed *26 from and the order of the Appellate Division brought up for review should be reversed and the case remanded for a determination of just compensation.[8]
Judgment appealed from and order of the Appellate Division brought up for review affirmed, with costs.
NOTES
[1] Apart from the takings claim, plaintiffs asserted a cause of action against the City for interference with their business and sought to enjoin the City from regrading the road. In addition, plaintiffs asserted a cause of action against the prior owners of the property and the prior owners' attorneys for fraudulent misrepresentations in connection with the sale of the property. The only cause of action at issue on this appeal is plaintiffs' takings claim against the City.
[2] Insofar as plaintiffs' real grievance is with the City's regulation requiring the maintenance of lateral support to the roadway, the issue might be characterized as a regulatory rather than a physical taking. Although the City physically placed the side fill on plaintiffs' property, it did so only after plaintiffs refused to discharge their obligation under the City Charter to do the work (see, NY City Charter § 2904 [2]; accord, Hoeck v City of Portland, 57 F.3d 781, 787 [9th Cir] [city's demolition of structure on plaintiff's property "was not a physical taking for public use * * *, it was a restriction on the use of the property to maintain an abandoned structure"], cert denied 516 US 1112). Moreover, the property owner, not the City, continues to own the area containing the side fill, and the owner can do whatever it likes to that area as long as lateral support to the roadway is maintained (see, Loretto v Teleprompter Manhattan CATV Corp., supra, 458 US, at 440, and n 19).
[3] We acknowledge the language in the Supreme Court's opinion in Nollan v California Coastal Commn. (483 US 825, 833, n 2) indicating that the regulatory restriction in that case did not inhere in the plaintiffs' title even though plaintiffs had constructive notice of the restriction when they acquired the property. However, we think the Nollan footnote is readily harmonized with the "logically antecedent inquiry" subsequently elucidated in Lucas (see generally, Mandelker, Investment-Backed Expectations in Takings Law, in Takings, op. cit., at 135-138 [concluding that the Nollan footnote should not be understood as prohibiting inquiry into preexisting statutory or regulatory restrictions]). Specifically, the property interest allegedly taken in Nollan was not subject to any preexisting restriction; rather, the case centered on a State agency's policy of conditioning the grant of building permits on the property owner's surrender of a public easement over the beachfront property (see, Nollan v California Coastal Commn., supra). Because plaintiffs' predecessors in interest had neither applied for nor been granted the conditioned permit, the government's interest in the easement was, at the time of plaintiffs' acquisition of the property, a mere "unilateral claim of entitlement," not an enforceable property interest (id., at 833, n 2 [emphasis added]). There was simply no existing title restriction which a purchaser took subject to in that case. We believe that a different situation would have been presented in Nollan, and a different result compelled under Lucas's "logically antecedent inquiry," if the property was already subject to a conditioned permit when plaintiffs acquired it.
[4] Under current law, the City provides a limited claims procedure for actual physical damage caused by its regrading projects (see, Administrative Code of City of NY §§ 3-316  3-320). Specifically, recovery is limited to change-of-grade damages to preexisting buildings or improvements (see, Administrative Code § 3-318 [a]). In March 1991, plaintiffs filed a notice of claim with the City pursuant to this provision, the outcome of which is not contained in the record. Nevertheless, insofar as the issue on appeal relates to the separate question of lateral support, which is addressed elsewhere in the City Charter and Administrative Code, this claims procedure is inapposite.
[5] We note that another dictionary first defines "sunken" as "submerged, esp[ecially]: lying at the bottom of a body of water" (see, Merriam-Webster's Collegiate Dictionary 1180 [10th ed]). Of course, the term "sunken" as used in section 2904 does not mean underwater, but has the meaning that best comports with its statutory context and purpose.
[6] The dissent's contention that "an easement on plaintiffs' property was not created when the City filed the map raising the legal grade of the street" (dissenting opn, at 25) is beside the point since the filing of the revised map "final[ly] and conclusive[ly]" established a higher legal grade (Administrative Code § 25-101). Whether denominated an easement, a servitude or simply a restriction on title, plaintiffs took their property subject to the City Charter obligation requiring lateral support to the previously established legal grade. The dissent's related assertion that "[u]ntil the City actually raised the grade of the street * * * it would have been impossible to determine the extent" of any taking (dissenting opn, at 25) is similarly misdirected given that plaintiffs' property interests "are defined by those State laws enacted and in effect at the time [plaintiffs] took title and they are not dependent on the timing of State action pursuant to such laws." (Matter of Gazza v New York State Dept. of Envtl. Conservation, supra, 89 NY2d, at 616.)
[7] If plaintiffs had purchased the property at the legal grade, and the City thereafter raised the legal grade of the roadway, a different takings question might be presented.
[8] Although the Supreme Court made this observation in discussing a court's application of common-law nuisance doctrine (while disavowing reliance on the Legislature's stated general justification for newly enacted "confiscatory" laws), this proposition should extend to judicial interpretation of any preexisting State law for the same reasons explained above that the threshold inquiry into title should not be limited to nuisance law.
[9] Plaintiffs paid $800,000 for the property, and it is unclear whether this purchase price actually included an adjustment for the lateral-support obligation. In their complaint, plaintiffs alleged that the prior owners of the property deliberately failed to tell them of the City's plan to raise the street to its legal grade. Whatever the merits, this sort of claim is properly asserted against other parties to the transaction, not against the City of New York in the guise of a takings claim.
[1] Specifically, the notice read as follows:

"This Department intends to improve to its legal grade the street abutting your property. This will result in the raising of the street elevation approximately 5.0 feet, subject to modification. To protect the street against the resulting lower grade of your property and to maintain the street at legal grade requires that side fill be placed on your property.
"Your consent to permit the placing and sloping of such side fill by the Department of Highways or its agents is requested. Please sign and send one copy of the accompanying `CONSENT' form to this office in the enclosed stamped self-addressed envelope within ten (10) days from the date stamped on the return receipt. Retain the second copy for your records.
"There will be no charge to you for the placing and sloping of side fill on your property if the return of the signed form is timely. You, however, will be responsible for the removal and relocation of landscaping, fences, walks, stairs and other structures, whether or not they are attached to a building, which may be disturbed due to fill operations. The within consent in no way constitutes a waiver of or release from your obligation to construct and/or maintain the sidewalk abutting your property pursuant to Section 2903 & 2904 of the New York City Charter.
"In the event we do not receive the consent within the said ten (10) days, you may be required to fill your lot abutting the street to legal grade at your own cost. Upon your failure to do so, this Department may fill your lot to legal grade, the cost of which shall be due and payable and shall constitute a lien against your property."
[2] Moreover, the flexibility envisioned by the "different question" is not available to the plaintiffs here since dirt filling 2,400 square feet of a delineated area offers little room for plaintiffs' input or modifications. Although the plaintiffs may use the dirt deposited on their property, they are necessarily denied dominion over their property beneath the side fill. That area is occupied, and permanently so. Furthermore, a permanent physical taking may occur regardless of the size of the area occupied or the de minimis impact the taking has on the owner's use of the rest of his land (Loretto v Teleprompter Manhattan CATV Corp., supra, at 430).
[3] Section 2904 was amended in 1992 to add a reference to section 19-152 of the Administrative Code which provides that an order to "fill any sunken lot" following an inspection of the real property by a "departmental inspector" must be based on "risk or hazard assessment criteria" (see, L 1992, ch 813, §§ 2-3). The impact of this amendment, which did not take effect until after the occurrence of the events giving rise to this action, is not before us.
[4] Although not dispositive, it should be noted that only the obligation to repair sidewalks under section 2904 is referred to in the notice sent to plaintiffs in March 1990 by the DOT. The DOT notice contains no cited authority, statutory or otherwise, for which plaintiffs would have an obligation to raise their property to the level of the roadway.
[5] While the majority refers to the reference to "raised lot[s]" within section 2904 as somehow indicative of the proper meaning of "sunken," it should be noted that the reference to "raised lot[s]" was not added to the provision until 1977 (Local Laws, 1977, No. 27 of City of New York). Oversight of "sunken lots" has been included in the New York City Charter for decades (see, 1901 Greater NY Charter § 388; NY City Charter former § 230 [added by L 1962, ch 998, § 25]; People ex rel. Collins v Ahearn, 193 N.Y. 441, 444). Of course, "raised lot[s]" could also refer to the elevation of the lot itself rather than the lowering of the surrounding property.
[6] Neither may the majority's conclusion be supported by Laba v Carey (29 N.Y.2d 302). In that case, this Court noted that the City Charter places the responsibility for the maintenance and repair of sidewalks on the individual owner, thereby ensuring that sidewalks are at the legal grade which is "nothing more than a normal incident to the ownership of real property within the City of New York" (29 NY2d, at 312). The holding of that case is wholly dissimilar to the circumstances here. The issue in Laba was whether the legal grade applicable to the sidewalks would inhere in title when a variance had previously been granted by the City. Similar to zoning ordinances and variances thereto, the Court simply ruled that the legal grade and variance were properly considered limitations within title (see also, Matter of Gazza v New York State Dept. of Envtl. Conservation, supra). Here, there is no "legal" grade of plaintiffs' property. Moreover, the oft-cited duty to maintain and repair defective sidewalks is clearly dissimilar from the heretofore unknown obligation to add side fill over 2,400 square feet of one's property to protect a new, adjacent roadway construction.
[7] There is no evidence that the purchase price paid by plaintiffs was based upon an awareness of the obligations and rights announced by the majority. Indeed, plaintiffs sued the sellers for fraud because they allegedly were unaware of such duties.
[8] The issue of just compensation cannot be resolved on the current record. However, it should be noted that plaintiffs have the burden to demonstrate the value lost due to the taking and a conclusory assertion that the property is "worthless to them" is clearly insufficient.